UNITED STATES *v.* ANCAROLA.

*(Circuit Court, S. D. New York. January 26, 1880.)*

INVEIGLEMENT—INVOLUNTARY SERVICE AS STREET MUSICIAN—ACT OF JUNE 23, 1874, (18 ST. AT LARGE, 251.)

Motion for new trial.

*William P. Fiero,* Asst. Dist. Atty., for the United States.
*Charles S. Spencer,* for defendant.

BLATCHFORD, J. On the twenty-third of June, 1874, an act was passed by congress, (18 U. S. St. at Large, 251,) entitled "An act to protect persons of foreign birth against forcible constraint or involuntary servitude."

It provides that "whoever shall knowingly and wilfully bring into the United States, or the territories thereof, any person inveigled or forcibly kidnapped in any other country, with intent to hold such person so inveigled or kidnapped in confinement, or to any involuntary service, and whoever shall knowingly and wilfully sell, or cause to be sold, into any condition of involuntary servitude, any other person, for any

term whatever, and every person who shall knowingly and wilfully hold to involuntary service any person so sold and bought, shall be deemed guilty of a felony, and on conviction thereof be imprisoned for a term not exceeding five years, and pay a fine not exceeding $5,000."

Under this statute an indictment was found in this court against the defendant, charging, first, that he unlawfully, feloniously, knowingly, and wilfully brought into the United States, to-wit, into the city and county of New York, in the state of New York, one Francesco Libonati, a person who had theretofore been inveigled in the kingdom of Italy, with intent to hold said Libonati in confinement, and to an involuntary service of begging and of playing on musical instruments. A second count was like the first, substituting "forcibly kidnapped" for "inveigled." A third count was like the first, substituting "inveigled and forcibly kidnapped" for "inveigled." A fourth count charged that the defendant unlawfully, feloniously, knowingly, and wilfully held to an involuntary service of begging and playing on musical instruments one Francesco Libonati, a person who had theretofore been unlawfully and knowingly sold by certain persons, to the jurors as yet unknown, into a condition of involuntary servitude for a term of four years and six months, and had been theretofore, by the said Ancarola, bought for the service and servitude aforesaid, and for the term aforesaid, of the persons aforesaid. A fifth count was like the third count, except that it charged the intent of the defendant to be to hold Libonati to an involuntary service.

Two other indictments, with the same charges, were found against the defendant, except that one of them related to a person named Michele Quirino, and the other to a person named Giosue Givrieri. The three indictments came on for trial before this court, held by Judge Benedict, and a jury, and were consolidated by the court under the provisions of section 1024 of the Revised Statutes, and one trial was had on them as so consolidated. The jury found the defendant "guilty of the several offences charged in the indictments." The defendant now moves on the minutes of the trial, as

settled by the judge who tried the case, for a new trial and in arrest of judgment, the motion being made at an exclusively criminal term held under section 658 of the Revised Statutes, before the circuit judge and the two district judges named in section 613 of the Revised Statutes.

The evidence given on the trial showed these facts: The defendant arrived in the city of New York on the second of November, 1879, in a steamer from Europe, having with him seven boys, of whom the three persons named in the indictment were three. He came on shore with the seven boys. Mr. Jackson, superintendent of the depot at Castle Garden, where he landed, had a conversation with him there immediately after he landed. Mr. Jackson testified: "I asked this man if those children were with him, and he said they were. I then asked his name, and he told me Ancarola. I brought him up to the register's desk, and he registered their names. I asked him where they were going, and he said to Montreal, to their relatives there. I brought them inside then, and he handed me their passage ticket to Montreal, as evidence that they were going there." The children were not allowed to go with him. He was arrested on the eighth of November. At the trial no evidence was introduced by the defendant. The chief testimony for the government was that of the three boys named in the indictments, Quirino being 13 years old, and Libonati and Givrieri being each 11 years old.

The story of Libonati is this: He was born at Calvello, Italy. His mother is living there. His father is dead. The boy was working in a blacksmith shop for two and a half cents a day, making nails. He had two sisters and a brother in Calvello, and a brother and a cousin in New York. His family were poor. He could not play upon any musical instruments. His father had gone to New York, and had died there. The boy, being at his shop, was sent for by his mother, and went and found with her her brother and the defendant. His mother asked him if he wanted to go to America, and he said "Yes." His uncle said, "Go to America with this man?" and the boy said "Yes." The defendant said to the mother, "Will you give me your son?" and she said

"Yes." He also said to her that the boy was to play the harp in Chicago. The boy said that he wanted to play the violin, but the defendant said that he must play the harp, and the boy then said that he would play the harp. The boy went with his uncle to Naples, thence he went to Marseilles and London with another boy. At London he met the defendant and other boys, and they came from London to New York in the steamer. On the way over the defendant said to the boy, "If we get arrested say we are going to Montreal." The boy had no relations in Montreal.

The story of Quirino was this: His mother is living. His father died in New York. The boy was born in Calvello, Italy, and lived there. He is a relative of the defendant. He has a sister. His family are poor. He did not work at anything, but went to school. The boy and his mother, his uncle and the defendant, being together at Calvello, it was verbally agreed between the mother and the defendant that the boy was to be four years and a half with the defendant, in Chicago, and that the defendant was to give the mother 40 ducats. The defendant said: "You live four and a half years with me, and I will teach you the business, and whatever money you make you will give to me." The mother said: "If you want to go, go; I don't want to compel you to the contrary." The uncle said the same. The defendant told the boy he would have to learn the violin, and that he would be clothed and fed. The boy said that he would go. His uncle took him from Calvello to Marseilles. There he met the defendant, who took him to London, and thence to New York in the steamer. On the way over, the defendant told the boy to tell every one that he was going to see his uncle in Montreal. He did not have an uncle in Montreal.

The story of Givrieri is this: His father and mother are living in Calvello, Italy, where he was born. He has a brother and a sister. His mother proposed to the defendant to take the boy to America. The defendant had just returned from there. He said, in the presence of the boy, that America was a good place, and he talked of the "beautiful things of America." He said to the father and mother: "If you

let your son go with me he will do very well in America and send you plenty of money bye and bye." He said several times, in the hearing of the boy, that America was a good place, and that they would make plenty of money there, and that they were going to make money for him. The boy was to work, and all the money he was to give to the defendant. The defendant was to take the boy to Chicago and teach him music, and from Chicago he would take him further. This was said in the presence of the parents. They told the defendant not to ill-treat the boy and to feed him properly, and that if they should get a letter from him saying that he was not properly treated they would come and take him away. It was then agreed that the defendant should give the father 80 ducats, and that the boy should go with the defendant for four years and be fed and clothed by him, and taught music. The boy went to Marseilles, and there the defendant found him. On the way to New York, in the steamer, the defendant said to the boy: "Let us pray to God that we can pass through New York all right. After that I will teach you music." He gave the boy a paper with an address in New York where to go, and told him not to let himself be seen by any officer for they might arrest him, and if any one asked him what he was going to do not to say that he was going with a padrone. He also told him if any one asked what his business was to say that he was a printer, and if they asked where he was going to say that he was going to Montreal, and if they asked to whom, to say that he was going to an uncle. He did not have an uncle in Montreal.

The statute of Italy of December 21, 1873, referred to in the charge of the court to the jury, was put in evidence. Portions of the charge of the court to the jury were excepted to by the defendant. One portion of the charge was as follows: "In connection with the evidence in respect to the arrangement made in Italy, it will be important for you to consider the law of Italy relating to the employment of children in wandering professions. But it must be remembered that the accused is not on trial for violating the law of Italy, and cannot be found guilty by you because of any violation

of the law of Italy that you may believe to have been disclosed by the evidence. He must be found guilty, if at all, for a violation of the laws of the United States that you have heard read. The law of Italy has been admitted in evidence as bearing upon the question of inveiglement, and solely for the purpose of showing the character of the act to which the consent of these children was obtained in Italy.

"The law of Italy provides as follows: 'Section 1. Any person who shall entrust, or, under whatever pretence, shall commit, to natives or strangers, other persons of either sex, under the age of 18 years, though his or her own children or pupils, and any native or stranger who shall receive them, with the intent to employ them in the kingdom, in whatever manner, or under whatever denomination, in the practice of wandering professions, as    *    *    *    , witches, charlatans, errant players or singers, rope-dancers, guessers, fortune-tellers, animal exposers, beggars, and similar wanderers, shall be punished with imprisonment from one to three months, and fined from 51 to 250 lire.

" 'Section 3. Any one who shall trust or deliver in the kingdom, or take abroad, in order to trust or deliver to natives or strangers abroad, persons under 18 years of age, however his or her own children or pupils, and any native or stranger who shall receive such persons in order to take, trust or deliver them abroad, for the purpose to employ them, in whatever way, and under whatever denomination, in the practice of wandering professions, as shown in section 1, shall be punished with imprisonment from six months to one year, and fined from 100 to 500 lire.'

"You will observe that the arrangement to which the assent of these children was procured in Italy was unlawful, provided the children were intended to be employed in a wandering profession, such as errant players, or beggars, or similar wanderers.   It has been contended here that these children were not intended to be employed as wanderers, in violation of the law of Italy, because the evidence is that they were to be employed to play the harp or be musicians in Chicago. But, gentlemen, a child of 11 or 13 years of age may be a

wanderer in the streets of a great city, and if, upon consider-
ing the evidence, and what has been proved in regard to the
character of the arrangement made in Italy, and the age of
the children and their ability to earn money for the accused
by labor, you conclude that the arrangement made in Italy in
regard to those children, or either of them, contemplated the
delivery of the children to the accused to be by him brought
to this country for the purpose of being employed as beggars
or street musicians in Chicago, and that the child was then
and there enticed to consent to such an arrangement, then you
will be justified in finding that such child had been inveigled
in Italy." The foregoing portion of the charge was excepted
to by the defendant.

After charging that it must be "proved that the accused
brought the child here with the intent to hold the child when
so brought to involuntary service as a beggar or as a musi-
cian," the court proceeded as follows: "Upon this question
the age of the child is important, for, as you know, in regard
to some things a child of such tender years is incapable of
consent. The nature of the employment to which the accused
intended to put the child, the evidence in regard to the
arrangement made in Italy, and the ability of the child to
labor or play an instrument, are important circumstances in
this connection, also, for if you believe from the evidence
that the intention of the accused in bringing the child to this
country was to employ the child as a beggar or as a street
musician, for his own profit, and that such intended employ-
ment was one injurious to its morals and inconsistent with
its proper care and education, according to its condition,
then you will be justified in finding that he intended to hold
such child to involuntary service, as charged in the indict-
ment, and this, notwithstanding the fact that the child had
consented to the employment in Italy, and that no evidence
of a subsequent dissent, while under the control of the accused,
has been given."

The foregoing portion of the charge was excepted to by the
defendant. The defendant also contends that there was no
evidence that any of the children had been inveigled in Italy,

and no evidence that the defendant had the intent to hold any of the children to any involuntary service in this country.

"Inveigle," is defined by Worcester thus: "To persuade to something bad, to wheedle, to entice, to seduce, to beguile." He defines "entice" thus: "To allure to ill, to attract, to lure, to draw by blandishments or hopes, to decoy, to tempt, to seduce, to coax." To inveigle or persuade or entice necessarily implies that the person is persuaded or enticed, and yields assent as the result of the persuading or enticing. Yet the statute is founded on the view that the person so assenting and so inviegled may be brought here by one who knows the circumstances of the case, with the intent to hold such person to involuntary service, although the service be the one to which the inveigling related. The arrangement made in Italy was, clearly, a transfer of the children to the service of the defendant to earn money for him as street musicians in Chicago. They were of an age to be able to do so. The influence brought to bear upon them by their parents and uncles, and by the statements of the defendants, to induce them to consent, in view of their condition in life and their ages and their inexperience, was enticement and inveiglement. The charge on this subject was proper and not open to exception. *Moody* v. *The People*, 20 Ill. 315, 319.

In regard to the other portion of the charge, the children, in serving the defendant as street musicians, for his profit, to the injury of their morals, subject to his control, could not properly be considered as rendering him voluntary service. They were incapable of exercising will or choice affirmatively on the subject. They were cast off by their parents, in violation of the law of Italy, and their being in this country at all with the defendant was, on all the facts, really involuntary on their parts, although the sham form of their consent was gone through with. The charge seems to us entirely correct. *Moody* v. *The People*, 20 Ill. 315, 319; *The State* v. *Rollins*, 8 N. H. 550, 565. The observations already made, taken in connection with the testimony recited, show that there was ample evidence to warrant the jury in finding inveiglement in

Italy, and the intent of the defendant, with full knowledge of such inveiglement, to hold the children in this country to involuntary service to him as street musicians.

The motions are denied.