Cornelia G. Kennedy, Wellford and Krupansky, Circuit Judges, concurred and filed opinions.

Keith, Circuit Judge, dissented and filed opinion.

Ralph B. Guy, Jr., Circuit Judge, dissented and filed opinion, in which Boyce F. Martin, Jr., and Nathaniel R. Jones, Circuit Judges, and Lively, Chief Judge, joined.

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Ike KOZMINSKI, Margarethe Kozminski, and John Kozminski,**
**Defendants-Appellants.**

No. 84–1288.

United States Court of Appeals,
Sixth Circuit.

Reargued Dec. 16, 1985.

Decided April 16, 1987.

Carl Ziemba (argued), Detroit, Mich., for defendants-appellants.

Joel M. Shere, U.S. Atty., Detroit, Mich., Stephen L. Hiyama, Irv Gornstein (argued), Mildred M. Matesich, Wm. Bradford Reynolds, Walter W. Barnett, Dept. of Justice, Civil Rights Div., Washington, D.C., for plaintiff-appellee.

Before LIVELY, Chief Judge, and ENGEL, KEITH, MERRITT, KENNEDY, MARTIN, JONES, CONTIE*, KRUPANSKY, WELLFORD, MILBURN, GUY and NELSON, Circuit Judges.

MERRITT, Circuit Judge.

A jury convicted the defendants, a dairy farmer and his wife, of two federal crimes: (1) "willfully holding to involuntary servitude" two retarded farm workers,[1] and (2) conspiring to deprive the workers of their constitutional right to be free from "involuntary servitude" as guaranteed by the Thirteenth Amendment.[2] Their son was

---

* Honorable Leroy J. Contie became Senior Circuit Judge July 1, 1986.

1. Section 1584, Title 18, punishes as a felony: "Whoever knowingly and willfully holds to involuntary servitude or sells into any condition of involuntary servitude, any other person for any term, or brings within the United States any person so held...."

2. Section 241, Title 18, states the conspiracy offense as follows: "If two or more persons conspire to injure, oppress, threaten, or intim-

idate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States...."

The Thirteenth Amendment reads: "Section 1. Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

Section 2. Congress shall have power to enforce this article by appropriate legislation."

also convicted on the conspiracy charge. On appeal the defendants contend that the court below erred in broadly defining "involuntary servitude" to include purely psychological coercion in addition to slavery, peonage, serfdom and other forms of physical or legal coercion.[3] They also argue that the court below erred in admitting expert psychological testimony tending to show that the two victims were held in servitude through "involuntary conversion" or "brainwashing." After reconsidering the legislative development and purpose of the two nineteenth century criminal statutes in question, we agree with the defendants that the court below erred in defining involuntary servitude too broadly, and we agree that the psychological testimony should not have been admitted.

## I.

The government does not contend that the two men were forcibly held to work on the farm. In its *en banc* brief, the government concedes that the men were "free to leave," "came back on their own accord" but "believed they had no place else to go." Brief for Appellee at 15. Nevertheless the government contends that the defendants' efforts to isolate the men from contact with the outside world through a pattern of verbal and physical abuse, as well as harsh living and working conditions, exerted a form of extreme psychological coercion upon the men given their low intelligence. According to the government's theory of the case, this coercive conduct, referred to as "involuntary conversion" or "brainwashing," is sufficient to constitute "involuntary servitude."

The servants, Robert Fulmer and Louis Molitoris, lived and worked on the Kozminski dairy farm for more than ten years as general farm laborers. They brought in the cows for milking twice a day, cleaned up the barn during milking, repaired and cleaned farm equipment, hauled feed for the cows and did other farm chores. Dr. Harley Stock, a clinical psychologist, found that Fulmer's I.Q. is 67 and Molitoris' is 60.

Robert Fulmer lived in foster homes until he was eleven years old. He then entered a training school for boys where he learned to do general farm work. In the 1950's and 60's, he worked as a farm hand on various farms. One evening in 1967, Ike and Margarethe Kozminski and their son, Michael, picked up Fulmer on a road near the farm where he was working. Fulmer agreed to work for them in exchange for food and a place to live. Fulmer worked on the Kozminski's dairy farm in Stockbridge, Michigan until 1968 when he moved to the Kozminski's farm in Chelsea, Michigan.

The other farm worker, Louis Molitoris, had been institutionalized at the Ypsilanti State Hospital and had been a groundskeeper at a cemetery in Ann Arbor, Michigan prior to coming to the Kozminski's farm. In the early 1970's Molitoris was unemployed and lived on the streets of Ann Arbor. During the winter, Ike Kozminski, who also ran a barber shop, occasionally allowed Molitoris to come into his shop to get warm and to sleep. Ike Kozminski thereafter offered to give Molitoris a place to stay, food and cigarettes if he would work on the Kozminski dairy farm. Molitoris agreed.

The government offered testimony about the condition of Fulmer and Molitoris' life on the farm including their living quarters, their physical treatment, their isolation on the farm and how the Kozminski's held them out to the community. Several witnesses testified that the men lived in squalor. The trailer they occupied was filthy having no running water, a broken refrigerator and maggot-infested food. Never-

---

**3.** The trial court instructed the jury to incorporate the definition of involuntary servitude from § 1584 into § 241 which encompasses the Thirteenth Amendment. The parties do not challenge the process of incorporating the statutory definition into the constitutional definition, although the Kozminskis argue that the § 1584 definition which was incorporated was incor-

rect. For the reasons stated below, we agree that the § 1584 standard was incorrect, ·and it should not have been applied in either context. We do not reach the question of whether it was proper for the trial court to use the same standard for § 241 and § 1584 since this issue was not raised by the parties.

theless, the men apparently had working bathroom facilities nearby. Moreover, Fulmer and Molitoris were responsible for cleaning their own quarters. Mrs. Kozminski cooked meals for Fulmer when he lived at the Stockbridge farm until he told her he wanted to cook for himself. Thereafter, the Kozminskis provided Fulmer and later Molitoris with groceries.

The testimony about the men's physical treatment includes neighbors', tenants' and co-workers' descriptions of the men being slapped, choked and kicked on several occasions. John and Margarethe Kozminski denied striking the men. Ike Kozminski testified that he kicked Fulmer for hitting a cow with a crowbar and he threw a pail at him for not repairing a leak. Ike also testified that he hit Molitoris "as hard as I could," after Molitoris hit him while they were loading pigs.

The men often drove a tractor on the road. Several witnesses also testified that they had seen the men in town or in other locations away from the farm. On occasion they left the farm to visit family members or friends. They sometimes "sneaked away" from the farm. They "hid" with neighbors. Two witnesses testified that Ike, Margarethe and John Kozminski brought the men back to the farm and discouraged them from leaving. Four witnesses testified that the men asked them to remove them from the farm.

The government contends that the Kozminskis tried to isolate the men from their families and the outside world. The Kozminskis told visitors on the farm to ignore Fulmer and Molitoris and the men were told not to speak to visitors. Margarethe Kozminski pulled a telephone off the wall in the barn when Fulmer used it to call a neighbor. Shortly after Molitoris moved to the farm, Ike and Margarethe apparently ordered him to burn the trunk which contained his belongings, including family pictures, allegedly because they contained cockroaches. Ike Kozminski told Fulmer his brothers and sister did not care about him. Margarethe discouraged Fulmer's sister and brother from visiting him. She also discouraged Molitoris' sister from calling him.

Witnesses testified that the Kozminskis told neighbors and visitors to the farm the men were in their custody and were wards of the state, although Mrs. Kozminski denied these allegations. Both she and Ike Kozminski testified that at one time they had a farm hand who was a ward of the state.

The court below gave a general charge on involuntary servitude. Under its instructions, the jury could convict the defendants of holding the workers to involuntary servitude through psychological as well as physical coercion. It did not set out a specific theory of involuntary servitude or confine the jury's deliberations to a particular definition of the crime. Instead, it left the definition of "involuntary servitude" up to the jury under a general charge. This Court granted *en banc* review vacating the judgment of a three-judge panel of the Court, Judge Krupansky, dissenting, which had affirmed the convictions and judgments of the court below with respect to each defendant.

## II.

The Courts of Appeals are squarely in conflict in their interpretation of the words of § 1584, "whoever knowingly and willfully holds [another] to involuntary servitude." The two polar cases are *United States v. Shackney*, 333 F.2d 475 (2d Cir. 1964) (Friendly, J.), and *United States v. Mussry*, 726 F.2d 1448 (9th Cir.), *cert. denied*, 469 U.S. 855, 105 S.Ct. 180, 83 L.Ed.2d 114 (1984) (Reinhardt, J.). In *Shackney*, the Second Circuit gave "involuntary servitude" a narrow construction. The court effectively limited the concept to slavery and peonage: the use or threat of physical punishment to enforce work, and the use of state-imposed legal coercion to make a debtor work for his creditor.

The Ninth Circuit, like the trial court below and the panel decision of our Court, adopts a more expansive interpretation that includes the use of purely psychological coercion. The Ninth Circuit opinion, like the jury instruction of the court below,

leaves the precise nature of the crime to the jury under a general charge: "The crucial factor is whether a person intends to and does coerce an individual into his service by subjugating the will...." 726 F.2d at 1453. Although the Second and the Ninth Circuits differ on whether psychological coercion can cause "involuntary" servitude within the meaning of the statute, both courts agree that the coercion—physical, legal or psychological—must produce in the victim the same basic state of mind. The coercion must cause the victim to believe that he has "no alternative," *Mussry,* 726 F.2d at 1453, or "no way to avoid" the labor. *Shackney,* 333 F.2d at 486.

The difficulty of the statutory construction question presented and the lack of agreement among the Circuits have prompted us to reread and reconsider the unusual legislative development and history of § 1584. The history of the statute begins in 1807 when Congress passed a statute prohibiting the slave trade, and it ends in 1948 when Congress, while codifying the criminal laws into Title 18, combined the slave trade and involuntary servitude statutes into the present language of § 1584. (The text of these statutes and their historical development is summarized in a chart attached hereto as an Appendix.)

The words, "hold to involuntary servitude" as used in § 1584, emanate directly from an 1874 statute designed to outlaw the so-called *"Padrone"* system of importing, selling and exploiting the labor of Italian children in the United States. The 1874 *Padrone* statute punished "whoever shall knowingly and wilfully bring into the United States ... any person inveigled or ... kidnapped ... with intent to hold ... to any involuntary service," or "cause to be sold, into any condition of involuntary servitude, any other person." The 1874 statute goes on to say that "every person who shall knowingly and wilfully hold to involuntary service any [such] person ... shall be deemed guilty of a felony...." The original statute is narrower than the present § 1584 because the old statute requires that the victim be "imported" or "sold" prior to the servitude, whereas § 1584 eliminates the requirement of importation or sale prior to the holding of involuntary servitude.

The metamorphosis of the *Padrone* statute into its present form took place in two stages. The 1909 general revision of the criminal law altered the language of the old statute slightly but continued the requirement of importation or sale. At the time of this revision, Congress believed that the broad language of the 1874 statute should be retained because the *Padrone* system and other similar forms of exploitation still flourished. This sentiment is vividly illustrated by Senator Henry Cabot Lodge's remarks during debate on the 1909 revision:

> The fact, Mr. President, that slavery has long ceased to exist in this country does not seem to me to justify the abolition of statutes such as [these].... There are people who may be guilty of the crimes which those statutes are designed to punish. The Senator referred to a case on the Pacific coast where the Chinese were involved some years ago. I was on a committee of the Senate which investigated the question of the importation of Italian boys into this country.... I happen to be one of those who made investigation into what was known as the padrone system. *The padrones were men in New York who brought boys out from Italy and let them out for various purposes—shoeblacks, and one thing and another of that sort—and the boys were held in a condition of practical slavery.* We have tried to meet some of these difficulties by our immigration laws, but the fact that slavery has been abolished, the fact that it is a crime, does not seem to me to make it desirable, therefore, to do away with all the statutes which were designed to punish the crime and which make it a crime.
>
> *The declaration of the thirteenth amendment to the Constitution is not of itself sufficient ... so I think that statutes of similar nature on the statute books of the United States should remain in order to prevent crimes of that character, whether they occur among the Chinese immigrants or*

*whether among the padrones who exist in New York and in some of our other large cities.*

42 Cong.Rec. 1122 (1908) (statement of Sen. Lodge) (emphasis supplied).

Senator Heyburn, the chief proponent of the penal law revision, also argued for the reenactment of the *Padrone* statute in order to protect classes of individuals who "can not protect themselves":

> [T]his criminal statute is intended only to enable the law to reach those who come here without being a party to their coming here or without being a party to the disposition of their services or the control of their rights, *whether they be children of irresponsible years and conditions or whether they be people who, because of their environment or the conditions of their lives, can not protect themselves.*

42 Cong.Rec. 1115 (1908) (statement of Sen. Heyburn) (emphasis supplied).

After the reenactment and codification in 1909, the final stage in the metamorphosis of § 1584 occurred in 1948. The old slave trade statute and the *Padrone* statute were combined into § 1584, and the elements of the crime were changed. The combined statute continues to punish those who import, or buy or sell a person with intent to hold to involuntary servitude.[4] In addition, it also punishes those who just hold a person to involuntary servitude without kidnapping, importation or selling. The latter was not possible under either the old slave trade statute or the old *Padrone* statute.[5]

None of the cases listed above, which attempt to define or give content to a standard of involuntary servitude under § 1584, rely on the legislative purpose of the 1874 *Padrone* statute or its judicial interpretation. Judge Friendly in the *Shackney* opinion acknowledges this his-torical development but establishes the narrow Second Circuit standard—limited to physical and legal coercion—without drawing content from the old *Padrone* statute. Judge Friendly reasoned that since the 1948 codification of § 1584 "constitutes 'positive law,' ... our search must be for the meaning of § 1584 rather than of its two parents." 333 F.2d at 482. Since Judge Friendly believed the 1948 enactment "extinguished" this history, he did not draw on the old statute in framing a standard under § 1584. Neither do any of the other cases decided to date.

We believe it is a mistake to read § 1584 in isolation from the older statutes which produced it. Without the earlier statutes, particularly the *Padrone* statute, and the legislative purpose which animated them, § 1584 would not exist today. Section 1584 does not appear to have any legislative purpose or history aside from that associated with the parent statutes. We therefore believe it necessary to define § 1584 in terms of the nature of the evil which the two predecessor statutes sought to prevent.

Specifically, the legislative history surrounding the *Padrone* statute suggests that it was designed to reach a broader class of exploitation than was previously covered by laws dealing with slavery, involuntary servitude and peonage. The earlier laws clearly covered circumstances involving the use or threatened use of law or physical force to constitute a "holding in involuntary servitude." The *Padrone* statute was aimed at a form of exploitation that was more subtle: securing the services of an individual who is incapable of giving legally valid consent.

Judge Blatchford, writing two years prior to his elevation to the Supreme Court, illustrated this purpose of the *Padrone* statute in *United States v. Ancarola,* 1 F. 676 (C.C.S.D.N.Y.1880). In affirming An-

---

**4.** *See supra,* note 1.

**5.** This expansion was not inadvertent. The revision notes to § 1584 indicate that Congress deliberately eliminated the kidnapping requirement which had been a predicate to criminal liability in the predecessor statutes. 18 U.S.C. § 1584 historical and revision notes (1982).

Other than the changes enumerated in the revision notes, the 1948 recodification was not intended to extinguish the history of these statutes. *See* S.Rep. No. 1620, 80th Cong., 2d Sess. 1 (1984) ("The original intent of Congress is preserved.").

carola's conviction for violating the *Padrone* statute, Judge Blatchford addressed the propriety of the trial court's jury charge which had instructed that the age of the victims be taken into account in determining the voluntariness of their employment. Holding that age was indeed a relevant factor in considering the validity of the children's consent, Judge Blatchford emphasized their unfortunate circumstances:

> [T]he children, in serving the defendant as street musicians, for his profit, to the injury of their morals, subject to his control, could not properly be considered as rendering him voluntary service. They were incapable of exercising will or choice affirmatively on the subject. They were cast off by their parents, in violation of the law of Italy, and their being in this country at all with the defendant was, on all the facts, really involuntary on their parts, although the sham form of their consent was gone through with.

*Ancarola*, 1 F. at 683.

In our view, *Ancarola* thus stands for the important proposition that service can be involuntary where there exists "sham consent" as a result of several forms of legal incapacity.[6] The *Ancarola* standard was therefore not limited only to physical or legal coercion.

As discussed above, Judge Friendly does not focus on the *Padrone* statute and the interpretation thereof. The *Shackney*

standard thus fails to address the full range of conduct proscribed by § 1584 such as that held criminal in *Ancarola*. In establishing our standard, we have attempted to give effect to the 1874 statute in a way that is consistent with the principle of narrow construction of criminal statutes. Accordingly, the standard we adopt modifies the *Shackney* standard to include the type of servitude outlawed in the 1874 statute as interpreted in the *Ancarola* case.

■■■ We conclude that a "holding to involuntary servitude" occurs when (a) the servant believes that he or she has no viable alternative but to perform service for the master (b) because of (1) the master's use or threatened use of physical force, or (2) the master's use or threatened use of state-imposed legal coercion (*i.e.,* peonage [7]), or (3) the master's use of fraud or deceit to obtain or maintain services where the servant is a minor, an immigrant or one who is mentally incompetent. In cases in the last category, it must be shown that the servant is under a disability to recognize or resist the master's fraud or deceit because of the servant's vulnerability as a member of one of these classes. In order to be found guilty under the statute, the master must intentionally hold the victim to involuntary servitude in one of these proscribed ways.

This definition protects those whose services have been wrongfully obtained and who believe that they have no viable way

---

**6.** Judge Blatchford set forth the trial court's jury charge as follows:

> After charging that it must be "proved that the accused brought the child here with the intent to hold the child when so brought to involuntary service as a beggar or as a musician," the court proceeded as follows: *"Upon this question the age of the child is important, for, as you know, in regard to some things a child of such tender years is incapable of consent.* The nature of the employment to which the accused intended to put the child, the evidence in regard to the arrangement made in Italy, and the ability of the child to labor or play an instrument, are important circumstances in this connection, also, for if you believe from the evidence that the intention of the accused in bringing the child to this country was to employ the child as a beggar or as a street musician, for his own profit, and that

such intended employment was one injurious to its morals and inconsistent with its proper care and education, according to its condition, then you will be justified in finding that he intended to hold such child to involuntary service, as charged in the indictment, and this, *notwithstanding the fact that the child had consented to the employment in Italy, and that no evidence of a subsequent dissent, while under the control of the accused, has been given."*

*Ancarola,* 1 F. at 682 (emphasis supplied).

**7.** *See e.g., Pollock v. Williams,* 322 U.S. 4, 64 S.Ct. 792, 88 L.Ed. 1095 (1944); *Bailey v. Alabama,* 219 U.S. 219, 31 S.Ct. 145, 55 L.Ed. 191 (1911); IX A. Bickel & B. Schmidt, *History of the Supreme Court of the United States: The Judiciary and Responsible Government 1910–21* 820–907 (1984).

of avoiding the services demanded. The physical force and legal coercion prongs of our standard follow *Shackney* and its progeny in the Fourth, Fifth and Eleventh Circuits which outlaw various forms of slavery, serfdom and peonage.[8] The third prong emanates directly from the history of § 1584 and is designed to protect extremely vulnerable classes of individuals covered by the 1874 *Padrone* statute, classes similar to those who lack the capacity to contract at common law.

The Restatement (Second) Contracts § 12(2) discusses capacity to contract in relevant part as follows: "A natural person who manifests assent to a transaction has full legal capacity to incur contractual duties thereby unless he is (a) under guardianship, or (b) an infant, or (c) mentally ill or defective...." We also include immigrants because of the express purpose of the predecessor statute to § 1584, the *Padrone* statute.[9] This interpretation is supported by Senator Heyburn's statement quoted above that the slave trade laws were intended to protect "children of irresponsible years and conditions ... [and] people who, because of their environment or the condition of their lives, can not protect themselves." 42 Cong.Rec. 1115 (1908).

■ The District Court did not limit the masters or the servants covered by the statute to the narrow categories described above. The District Court's rulings and instructions would appear to criminalize general psychological coercion without fraud, deceit, force or legal coercion and would include all individuals within the covered class of victims subject to psychological coercion, not just the particularly vulnerable classes referred to in the legislative history of the statute. The Ninth Circuit's, the panel's and the District Court's broad definition might appear to place the day-to-day activities of cult groups, communes and religious orders within the coverage of the statute. Our standard would criminalize these activities only if the group engaged in one of the proscribed types of conduct.

■ We reverse and remand the case for new trial for these reasons. After a careful review of the evidence, we conclude that we should not order a judgment of acquittal, as the defendants contend, because there is evidence from which a jury could conclude (1) that the victims believed that they had no viable alternative but to perform the labor in question, and (2) that the victims were mentally incompetent and the defendants practiced fraud and deceit in maintaining the victims' services.

## III.

The Kozminskis also contest the admissibility of the expert psychological testimony

---

8. The Fourth Circuit requires the "threat of violence or confinement, backed sufficiently by deeds." *United States v. Harris,* 701 F.2d 1095, 1100 (4th Cir.), *cert. denied,* 463 U.S. 1214, 103 S.Ct. 3554, 77 L.Ed.2d 1400 (1983) (quoting *United States v. Booker,* 655 F.2d 562, 567 (4th Cir. 1981)). The Fifth Circuit requires "such fear of physical harm that the victim is afraid to leave, regardless of the victim's opportunities for escape." *United States v. Bibbs,* 564 F.2d 1165, 1168 (5th Cir.1977), *cert. denied,* 435 U.S. 1007, 98 S.Ct. 1877, 56 L.Ed.2d 388 (1978). According to the Eleventh Circuit, " [t]he use, or threatened use, of physical force to create a climate of fear is the most grotesque example of such coercion." *United States v. Warren,* 772 F.2d 827, 833–34 (11th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1214, 89 L.Ed.2d 326 (1986). The *Mussry* case is discussed at footnote 9 of the *Warren* opinion. Since the evidence was apparently sufficient under either standard, the court did not comment on adopting or rejecting *Mussry.*

9. In Section I of his dessenting opinion, Judge Guy derides the inclusion of immigrants in our standard by saying:

Furthermore, the inclusion of "immigrants" as a special class cannot be supported by reference to the *Padrone* statute as the majority opinion itself suggests. As the Appendix to the majority opinion itself indicates, the antecedent statutes reference "any person inveigled or forcibly kidnapped in any other country, with intent to hold such person so inveigled or kidnapped in confinement or to any involuntary service...." This is hardly the definition of an immigrant.

This same appendix sets forth the title of the statute as follows: "Chap. 464. An act to protect persons of foreign birth against forcible constraint or involuntary servitude." We think "persons of foreign birth" means "immigrant" and would not include kidnapping an "American in Paris"—a point amply supported by the legislative history set out above.

presented at trial by Dr. Harley Stock. Dr. Stock testified that given the victims' low mentality, the psychological pressures exerted upon them created an "involuntary conversion" to complete dependency akin to "captivity syndrome," a psychological phenomenon arising from prolonged physical captivity. This testimony was offered to show that Fulmer and Molitoris were the victims of psychological coercion and had been "brainwashed" into serving the Kozminskis. This evidence is inadmissible because a foundation was not laid to establish its conformity to a generally accepted explanatory theory.

■ The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence. Rule 702 states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

For expert testimony to be admissible under Rule 702, a four-part test must be met: (1) a qualified expert; (2) testifying on a proper subject; (3) *in conformity to a generally accepted explanatory theory;* (4) the probative value of which outweighs any prejudicial effect. *United States v. Green,* 548 F.2d 1261, 1268 (6th Cir.1977) (emphasis supplied); *United States v. Smith,* 736 F.2d 1103, 1105 (6th Cir.), *cert. denied,* 469 U.S. 868, 105 S.Ct. 213, 83 L.Ed.2d 143 (1984). The elements of this four part test under *Green* constitute preliminary questions for purposes of Rule 104(a) of the Federal Rules of Evidence. As such, the trial judge must find that the expert and the proposed testimony meet the *Green* criteria prior to admitting the testimony: this is not a jury question. *See* Fed.R.Evid. 104 advisory committee's note; 11 J. Moore & H. Bendix, *Moore's Federal Practice,* § 702.10[3] (2d ed. 1985).[10]

■ It does not appear that a proper foundation was laid under the third ele-

ment of the *Green* test. The criticisms voiced by Drs. Emanuel Tanay and Robert Walsh suggest that Dr. Stock's "involuntary conversion" theory is not scientifically-recognized. Dr. Tanay stated that he had never heard of Dr. Stock's "involuntary conversion" theory prior to trial. Dr. Tanay went on to note that the phenomenon of "ideological conversion" which is associated with captivity syndrome would have "no application" to the present situation, and that it would be "ridiculous" to attempt to apply it. Dr. Walsh testified that he considered involuntary conversion to be equivalent to brainwashing and opined that Dr. Stock's diagnosis "exceeded sound professional practice."

Dr. Stock attempted to establish his theory by incorporating the well-established "captivity syndrome." Although captivity syndrome is a generally accepted explanatory theory, it has no application to this case. Drs. Tanay and Stock both agreed that "captivity syndrome" has ten necessary elements:

(1) Prolonged captivity; (2) continuous around the clock supervision, such as guarding; (3) an isolated environment; (4) removal of all supports; (5) an attack on personality; (6) a lack of privacy; (7) assault upon the total personality; (8) a systematic use of reward and punishment; (9) a tearing of the fabric of the personality; and (10) the building up of a new personality.

These factors are not present in this case. There is no evidence that Fulmer and Molitoris were subjected to conditions equivalent to those described above. For example, there was no evidence of actual captivity, a necessary element of captivity syndrome. This list of conditions describes the process employed by the Chinese to "brainwash" prisoners of war during the Korean conflict. As bad as conditions on the Kozminski's dairy farm are alleged to be, they fall short of those found in a Chinese prison camp. Accordingly, captivity syndrome is inapplicable as a matter of law given the facts of this case. There-

---

**10.** The argument that *United States v. Green* should be overruled is made for the first time in Judge Guy's en banc dissent, and the court has not considered or voted on this issue.

fore, a proper foundation was not laid for Dr. Stock's testimony under the third element of the *Green* standard and it should have been excluded.

Accordingly, the judgment of the District Court is reversed and the case remanded for a new trial under the standards enunciated herein.

# APPENDIX
## Historical Development of 18 U.S.C. § 1584

| | Act of March 2, 1807, Ch. 22, § 6, 2 Stat. 427 | Act of April 20, 1818, Ch. 91, § 6, 3 Stat. 452 | Act of June 23, 1874, Ch. 464, 18 Stat. 251 | Act of March 4, 1909, Ch. 321, §§ 248, 271, 35 Stat. 1139–42 | Act of June 25, 1948, Ch. 645, 62 Stat. 773 (codified at 18 U.S.C. § 1584 (1982)) |
|---|---|---|---|---|---|
| Slave Trade Statute | Sec. 6. And be it further enacted, That if any person or persons whatsoever, shall, from and after the first day of January, one thousand eight hundred and eight, purchase or sell any negro, mulatto, or person of colour, for a slave, or to be held to service or labour, who shall have been imported, or brought from any foreign kingdom, place, or country, or from the dominions of any foreign state, immediately adjoining to the United States, into any port or place within the jurisdiction of the United States, after the last day of December, one thousand eight hundred and seven, knowing at the time of such purchase or sale, such negro, mulatto, or person of colour, was so brought within the jurisdiction of the United States, as aforesaid, such purchaser and seller shall severally forfeit and pay for every negro, mulatto, or person of colour, so purchased or sold as aforesaid, eight hundred dollars; one moiety thereof to the United States, and the other moiety to the use of any person or persons who shall sue for and prosecute the same to effect: Provided, that the aforesaid forfeiture shall not extend to the seller or purchaser of any negro, mulatto, or person of colour, who may be sold or disposed of in virtue of any regulation which may hereafter be made by any of the legislatures of the several states in that respect, in pursuance of this act, and the constitution of the United States. | Sec. 6. And be it further enacted, That if any person or persons whatsoever shall, from and after the passing of this act, bring within the jurisdiction of the United States, in any manner whatsoever, any negro, mulatto, or person of colour, from any foreign kingdom, place, or country, or from sea, or shall hold, sell, or otherwise dispose of, any such negro, mulatto, or person of colour, so brought in, as a slave, or to be held to service or labour, or be in any wise aiding or abetting therein, every person so offending shall, on conviction thereof by due course of law, forfeit and pay, for every such offence, a sum not exceeding ten thousand nor less than one thousand dollars, one moiety to the use of the United States, and the other to the use of the person or persons who shall sue for such forfeiture, and prosecute the same to effect; and, moreover, shall suffer imprisonment, for a term not exceeding seven years nor less than three years. | | Sec. 248. Whoever brings within the jurisdiction of the United States, in any manner whatsoever, any person from any foreign kingdom or country, or from sea, or holds, sells, or otherwise disposes of, any person so brought in, as a slave, or to be held to service or labor, shall be fined not more than ten thousand dollars, one half to the use of the United States and the other half to the use of the party who prosecutes the indictment to effect; and, moreover, shall be imprisoned not more than seven years. | § 1584. Sale into involuntary servitude<br><br>Whoever knowingly and willfully holds to involuntary servitude or sells into any |

Historical Development of 18 U.S.C. § 1584

| "Padrone" Statute | Act of March 2, 1807, Ch. 22, § 6, 2 Stat. 427 | Act of April 20, 1818, Ch. 91, § 6, 3 Stat. 452 | Act of June 23, 1874 Ch. 464, 18 Stat. 251 | Act of March 4, 1909, Ch. 321, §§ 248, 271, 35 Stat. 1139–42 | Act of June 25, 1948, Ch. 645, 62 Stat. 773 (codified at 18 U.S.C. § 1584 (1982)) |
|---|---|---|---|---|---|
| | | | Chap. 464. An act to protect persons of foreign birth against forcible constraint or involuntary servitude.<br><br>Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That whoever shall knowingly and wilfully bring into the United States, or the Territories thereof, any person inveigled or forcibly kidnapped in any other country, with intent to hold such person so inveigled or kidnapped in confinement or to any involuntary service, and whoever shall knowingly and wilfully sell, or cause to be sold, into any condition of involuntary servitude, any other person for any term whatever, and every person who shall knowingly and wilfully hold to involuntary service any person so sold and bought, shall be deemed guilty of a felony, and, on conviction thereof, be imprisoned for a term not exceeding five years and pay a fine not exceeding five thousand dollars. | Sec. 271. Whoever shall knowingly and willfully bring into the United States or any place subject to the jurisdiction thereof, any person inveigled or forcibly kidnaped in any other country, with intent to hold such person so inveigled or kidnaped in confinement or to any involuntary servitude; or whoever shall knowingly and willfully sell, or cause to be sold, into any condition of involuntary servitude, any other person for any term whatever, or whoever shall knowingly and willfully hold to involuntary servitude any person so brought or sold, shall be fined not more than five thousand dollars and imprisoned not more than five years. | condition of involuntary servitude, any other person for any term, or brings within the United States any person so held, shall be fined not more than $5,000 or imprisoned not more than five years, or both. |

CORNELIA G. KENNEDY, Circuit Judge, concurring.

I concur generally in Judge Merritt's opinion. However, because he adopts a totally subjective standard of involuntariness, I think there needs to be some mention of the relationship of the standard to the intent of the defendants. Psychological coercion which can be established only through testimony of expert witnesses presents a significant problem with respect to a defendant's intent and knowledge. Can a master be guilty of holding someone in involuntary servitude where the master, a lay person, doesn't know that the servant remains involuntarily? If expert testimony is necessary for the jury to find the servitude involuntary, it would seem that a defendant also needs that expert knowledge.

Where the master uses force or the threat of force or state-imposed legal coercion to require the servant to remain, the intent to hold the servant in involuntary servitude is apparent. Here evidence that the master treated the servants cruelly and provided deplorable living conditions was relevant to establishing involuntariness only because of the clinical psychologist's testimony that such treatment, alternated with kind treatment, such as providing a nice Sunday dinner, made the servants dependent and unable to leave. Conduct which had such effect, but without evidence that the master knew or should have known of that effect, does not tend to prove intent. In the case of psychological coercion, the jury should be required to find that the defendant knew his conduct would cause the victim to remain involuntarily. The master does not hold the servant to involuntary servitude unless the master knows that the servant serves involuntarily.

I agree that the case should be remanded for a new trial because of defendants' acts which made it less likely that others would help Fulmer and Molitoris to leave the farm; the jury could find these acts were intended to keep them there and that the victims were incapable of acting on their own initiative. Representation by the Kozminskis that Fulmer and Molitoris were wards of the court, acts which isolated the victims from their families and the community, and telling the victims that they had no place to go or would have to return to an institution, could be found to be fraud or deceit which prevented Fulmer and Molitoris from leaving the farm and prevented others in the community from assisting them to do so, when they were incapable of acting on their own.

WELLFORD, Circuit Judge, concurring:

While I am disposed toward the standard set by Judge Friendly in this kind of case in *United States v. Shackney*, 333 F.2d 475 (2d Cir.1964), and I likewise do not adopt the rationale set out in *United States v. Mussry*, 726 F.2d 1448 (9th Cir.), *cert. denied*, 469 U.S. 855, 105 S.Ct. 180, 83 L.Ed.2d 114 (1984), I am persuaded by Judge Merritt's reasoned analysis of both principal issues in this case, and I therefore concur in Parts I, II and III and the result ultimately reached.

It seems to me that perhaps the best expression of the rule is set out in *United States v. Bibbs*, 564 F.2d 1165, 1168 (5th Cir.1977), which requires proof of physical harm or reasonable fear of harm and coercion imposed by a defendant on a victim before a prosecution may be sustained:

[A] defendant is guilty of holding a person to involuntary servitude if the defendant has placed him in such fear of physical harm that the victim is afraid to leave regardless of the victim's opportunities for escape.

I would therefore reverse and remand in this case.

KRUPANSKY, Circuit Judge, concurring.

I concur in Judge Merritt's well-reasoned opinion and the decision of the majority to reverse the judgment of the trial court and its order to remand this case for further action not inconsistent with the judgment of the majority of the en banc court.

I write separately merely to observe that Dr. Stock, speaking through the record, takes exception to the following hypotheses

upon which the logic of the dissent seeks to evolve its reasoning:

1. that his expert opinion testimony advancing the novel concept of involuntary conversion and its relationship to involuntary servitude was not anchored in the scientifically accepted theory of captivity syndrome;

2. that his novel concept was not a scientific explanatory theory of first impression but one that had gained general acceptance within the particular scientific field to which it belonged;

3. that the transcript of the record does not contest his novel concept as scientific theories that had gained general acceptance within the particular scientific field to which they belonged.

Dr. Stock insisted throughout his testimony, as demonstrated by the record, that the scientifically recognized and accepted theories of "captivity syndrome" and "post-traumatic stress disorder" were seminal to his concept of "involuntary conversion" as it related to involuntary servitude. The entire thrust of the government's evidence was structured upon the keystone of his efforts to correlate his conclusions with "captivity syndrome" and "post-traumatic stress disorder." His inability to accomplish this calculated result within the mandates of existing legal precedent gives rise to this order of reversal and remand to the trial court.

It should be initially noted that the defendants were convicted of a conspiracy to violate the rights of Fulmer and Molitoris to be free from involuntary servitude in violation of 18 U.S.C. § 241 and of actually holding Fulmer and Molitoris to involuntary servitude and preventing them from leaving the farm where they worked in violation of 18 U.S.C. § 1584. Both charges mandated proof of intent to commit the offenses.

It was not the government's theory in presenting this case that either Fulmer or Molitoris were restrained from leaving the farm and the defendants' employment by either physical force or threats of physical force. Rather, it was the thrust of the government's proof that both Fulmer and Molitoris, as a result of an "involuntary conversion" became "psychological hostages" and lost their "will" to leave the farm and the service of the defendants.

Dr. Stock's testimony was the only evidence that addressed the very essence of the government's charges, and was, therefore, the sine qua non of the jury's verdict, without which the conviction could not stand.

An appropriate point of departure for my chronology is a definition of and purpose for the rule that identifies the standard to be applied in considering the admissibility of scientific evidence in the form of expert testimony.

The rule is simply stated in *United States v. Brown*, 557 F.2d 541, 556 (6th Cir.1977), and echoed in its progeny within and without this circuit in the following language:

A necessary predicate to the admission of scientific evidence is that the principle upon which it is based "must be sufficiently established to have gained general acceptance in a particular field to which it belongs," *Frye v. United States*, 54 App.D.C. 46, 293 F. 1013, 1014 (1923). In *United States v. Franks*, 511 F.2d 25, 33 n. 12 (6th Cir.1975), we equated general acceptance in the scientific community with a showing that the scientific principles and procedures on which the expert testimony is based are reliable and sufficiently accurate.

The purpose for the rule is equally simple. It evolved to avoid the potential prejudicial impact of "the aura of special reliability and trustworthiness" which attaches to expert testimony admitted without proper foundation which may confuse or mislead the trier of fact and thus defeat a defendant's right to a fair trial.

Perhaps the purpose behind the rule is best articulated in *Brown*, 557 F.2d at 556, where this court admonished:

A courtroom is not a research laboratory. The fate of a defendant in a criminal prosecution should not hang on his ability to successfully rebut scientific evi-

dence which bears an "aura of special reliability and trustworthiness," although in reality the witness is testifying on the basis of an unproved hypothesis in an isolated experiment which has yet to gain acceptance in its field. *See e.g., United States v. Amaral,* 488 F.2d 1148, 1152 (9th Cir.1973); *Frye v. United States,* 293 F. at 1014.

The permissible limits of expert testimony have been traditionally delegated to the sound discretion of the trial court. The scope of this discretion has been broadly construed, and the trial court's exercise of its discretion is to be sustained "unless it is manifestly erroneous." *Brown,* 557 F.2d at 556; *United States v. Green,* 548 F.2d 1261, 1268 (6th Cir.1977). *See also United States v. August,* 745 F.2d 400, 407 (6th Cir.1984). However, such discretion must be exercised, on an ad hoc basis, by balancing the probative value of the evidence against its prejudicial effect upon the defendant's right to a fair trial. *See* Fed.R. Evid. 403.

I fully recognize and endorse the proposition that absolute certainty of result or unanimity of scientific opinion is not required for admissibility so long as the conflicting testimony concerning the conclusions drawn by the experts are based on generally accepted and reliable scientific principles.

Having reviewed the rule that is decisive to the admissibility of a scientific explanatory theory and the purpose for its existence, it is obvious that expert testimony is not permissible in every case where the witness purports to base his testimony on ostensibly scientific principles. *See, e.g., Frye v. United States,* 293 F. 1013 (D.C. Cir.1923); *United States v. Franks,* 511 F.2d 25, 33 n. 12 (6th Cir.), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 693 (1975); *United States v. Green,* 548 F.2d 1261 (6th Cir.1977); *United States v. Brown,* 557 F.2d 541 (6th Cir.1977); *United States v. Brady,* 595 F.2d 359 (6th Cir.), *cert. denied,* 444 U.S. 862, 100 S.Ct. 129, 62 L.Ed.2d 84 (1979); *United States v. Amaral,* 488 F.2d 1148 (9th Cir.1973).

Mindful of the rule, its purpose, and the parameters of its application, my observations merely attempt to present an analysis of the scientific conclusions and concepts applied by Dr. Stock to the facts of this case.

Factually, it is conceded that both Fulmer and Molitoris were mentally retarded, however, not to the degree inferred in the dissenting opinion. The record reflects that both individuals had an acute awareness of their past activities, their existing environment, working conditions, and their general responsibilities and duties. They were well-oriented as evidenced by their abilities to attend, understand, and enjoy baseball games; to understand and follow the various serial presentations of "soap operas" and other television programs which they viewed on a daily basis in their trailer on a television set furnished by the defendants; and to visit and converse with neighbors from time to time and return to the defendants' farm. Their personal appearance, hygiene, and living conditions within the house trailer furnished by the defendants were of their own choice. Bunks, running water, soap, and showers were always available to them in the bunkhouse. The defendants imposed no regimen upon the lifestyles adopted by the two men. As a matter of fact, although the Kozminskis resided in the vicinity of the farm where Fulmer and Molitoris lived and worked, they seldom visited the farm more frequently than once a week. Fulmer often complained that John Kozminski's single visit was too isolated to provide Kozminski with an insight into the problems inherent to operation of the farm.

The lifestyles of both Fulmer and Molitoris prior to coming to the defendants' farm reflected an unfortunate history of aimless dereliction without significant family relationships. Prior to working as a farm hand for the defendants, Molitoris, who was 60 years of age, was a street person who got his food where he found it, "had slept in cardboard boxes in the winter" and in an old ice box, and "drank homemade wine." Fulmer, age 59 years, had lived in a foster home from age 5 to 11 years and was thereafter institutionalized,

where he was taught to work as a farm hand. Upon release from the institution, he drifted from farm to farm performing the same simple, menial chores he performed for the defendants.

Of greatest significance in addressing the opinion testimony of Dr. Stock within the context of this case are the concessions of the parties that (a) neither Fulmer nor Molitoris were ever physically confined or restrained; (b) they were at all times physically free to leave the farm at will; (c) *they knew they were free to leave the farm;* (d) *they did in fact individually and together leave the farm on numerous occasions;* (e) they returned of their own accord or were picked up by the defendants as a result of telephone calls from third parties;[1] (f) they associated freely with each other, with other farm hands working the farm, and with neighbors on occasion; (g) they remained at or returned to the defendants' farm, in the words of Fulmer, "because he had no place to go."

Dr. Stock tailored his purported scientific opinions to the above related facts and concluded that, as a result of the living conditions to which Molitoris and Fulmer were intentionally exposed by the defendants, the two men experienced, in Dr. Stock's coined terminology, an "involuntary conversion," became "psychological hostages," and thus were held to involuntary servitude by the defendants' willful acts as charged in the indictment.

In determining the admissibility of Dr. Stock's expert testimony within the pronouncements of existing precedent as discussed herein, I am directed to the guidelines enunciated in *United States v. Amaral,* 488 F.2d 1148 (9th Cir.1973), and subsequently adopted by this circuit in *Green,* 548 F.2d at 1268, and applied in *Brown,* 557 F.2d at 566, and *United States v. Smith,* 736 F.2d 1103, 1105 (6th Cir.), *cert. denied,* 499 U.S. 868, 105 S.Ct. 213, 83 L.Ed.2d 143 (1984):

> Four factors must appear in the record to uphold the admission of expert testimony: 1. qualified expert; 2. proper sub-

ject; 3. conformity to a generally accepted explanatory theory; and 4. probative value compared to prejudicial effect.

*Brown,* 557 F.2d at 556.

The third element enumerated in *Amaral* provides that such expert testimony must be in "conformity to a generally accepted explanatory theory." Implicit in the language is the predicate that the theory be firmly anchored in sound, reliable, and sufficiently accurate scientific principles, and sufficiently established to the point of having achieved general acceptance within the particular field to which it belongs. Stated differently, the scientific explanatory theory must have (a) received at least some exposure within the scientific peerage to which it belongs; (b) received peer evaluation to determine its scientific validity and reliability; and (c) achieved general acceptance within the scientific community to which it belongs.

Apart from the comments of his scientific peers, Dr. Stock's own admissions render his conclusions inadmissible under existing legal standards. At the outset, Dr. Stock's progression from "involuntary conversion" through "psychological hostage" to the ultimate result of "involuntary servitude" must be distinguished from his testimonial discussion of "captivity syndrome" and "post-traumatic stress disorder." The distinction is critical to an analysis of his testimony since "captivity syndrome" and "post-traumatic stress disorder" are mutually exclusive and have independent origins, as will be more fully hereinafter discussed.

The "captivity syndrome," as a characterized condition, had its genesis as a predictable scientific phenomenon in 1924 when Ivan Pavlov, a Russian physicist, first perceived the relationship between prolonged physical and equivalent mental stress and control of behavior patterns. The subject again received considerable notoriety as a result of a proliferation of prisoner of war and concentration camps that existed during World War II.

---

1. On occasions when Fulmer or Molitoris were picked up as a result of telephone calls from third parties, there is no indication that they were forcefully returned to the farm.

The practice, characterized in early scientific literature as the Triple-D Syndrome (debility, dependency, and dread), was refined into a highly sophisticated and effective ordeal by the Chinese during the Korean conflict. In published research, Dr. Robert Lifton, a noted psychiatrist, synthesized the concepts of "captivity syndrome" from his exhaustive studies and clinical evaluations of returning Americans held captive by the Chinese during the Korean war.

Obvious from the foregoing brief summary, the Triple-D Syndrome, currently characterized as "captivity syndrome," had received wide exposure within the scientific community to which it belongs, had been evaluated by the peerage of that scientific community, and had received acceptance within that group, thereby satisfying the third criterion of *Amaral*. Equally well recognized within the peer group of psychiatrists and psychologists was the diagnosis of "post-traumatic stress disorder." This diagnosis had, perhaps, received even greater exposure and acceptance than "captivity syndrome."

It is interesting to note at this juncture that an examination of Dr. Stock's testimony discloses that whenever he resorted to supporting an opinion or conclusion by published research or peer endorsement, he referred, with experienced subtlety, not to his theory of progression from "involuntary conversion" through "psychological hostage" to "involuntary servitude," but rather to the conditions of "captivity syndrome" and "post-traumatic stress disorder," both of which philosophies had received recognition and acceptance within the scientific community to which they belong.

Dr. Stock's damaging, if not fatal, admissions condemned his opinion testimony as a hypothecation that had not "attained general acceptance in the scientific community." *Brown* at 556. He readily conceded that he was not aware of *any* literature, let alone published research, that addressed his theory; that the Diagnostic and Statistical Manual of Mental Disorders (Third Edition), the recognized official authority of the American Psychiatric Association, carried no listing for "involuntary conversion" or "psychological hostage"; that his theory had never received peer recognition; and that he could not correlate his concepts to Dr. Lifton's "captivity syndrome." The coup de grace was, however, delivered by his own statements that his instant testimony represented *the first case* wherein he advanced his hypothecations of "involuntary conversion" and its relationship to "involuntary servitude."[2] It is no wonder that his peers were initially unaware of his theory, and after having been apprised of his logic, characterized it as exceeding "sound professional practice, confused the situation" and "ridiculous" and an "invention of Stock." Accordingly, the record disclosures make it evident that if, as Dr. Stock testified, his instant testimony was the first public presentation of his theory, it necessarily followed that it never received peer evaluation or validation, let alone recognition as an explanatory theory that had attained general acceptance within the scientific community to which it belonged within the mandates of existing precedent. *See Green, Brown, Brady, Franks.*

It is perhaps appropriate at this point to interpose my approval of the pronounce-

---

2. Q. What is your clinical experience with involuntary servitude as opposed to involuntary conversion?
A. This is actual—this is my first case of involuntary servitude.
Q. So this is the first case that you have dealt with the so-called stress, or whatever—however you want to phrase it—was not immediate and obvious?
A. No. I think the threat in this case was immediate and obvious.
Q. That is the conclusion you reached, isn't it?

A. That is right.
Q. But your testimony is you have never dealt with this type of situation before; isn't that correct?
A. That's correct.
Q. You have never testified with regard to this situation before?
A. Well, if I have never dealt with it, I never could have testified before.
Q. You have never been called upon to make a diagnosis or an evaluation in this area before; is that right?
A. Right.

ments in *United States v. Stifel,* 433 F.2d 431, 438 (6th Cir.1970), *cert. denied,* 401 U.S. 994, 91 S.Ct. 1232, 28 L.Ed.2d 531 (1971), that "neither newness nor lack of absolute certainty in a test suffices to render it inadmissible in court. Every new development must have its first day in court." The expression in *Stifel,* however, must be tempered with the longstanding teachings of *Green, Brown, Brady,* and *Franks.* Certainly, the application of *Stifel* would not apply to a theory of first impression as testified to by Dr. Stock.

In *Brown,* this court recognized the hazards of exposing the trier of facts to ostensibly scientific techniques which defied effective response under circumstances where the scientific theory had no demonstrable standard against which it could be evaluated, tested, or duplicated:

> There are good reasons why not every ostensibly scientific technique should be recognized as the basis for expert testimony. Because of its apparent objectivity, an opinion that claims a scientific basis is apt to carry undue weight with the trier of fact. In addition, it is difficult to rebut such an opinion except by other experts or by cross-examination based on a thorough acquaintance with the underlying principles. In order to prevent deception or mistake and to allow the possibility of effective response, there must be a demonstrable, objective procedure for reaching the opinion and qualified persons who can either duplicate the result or criticize the means by which it was reached, drawing their own conclusions from the underlying facts.

*Brown,* 557 F.2d at 556, *quoting United States v. Baller,* 519 F.2d 463, 466 (4th Cir.), *cert. denied,* 423 U.S. 1019, 96 S.Ct. 456, 46 L.Ed.2d 391 (1975).

The scope and magnitude of the confusion and prejudice generated by Dr. Stock's testimony cannot be fully appreciated without an analysis of his reasoning. Dr. Stock postulated "*in this particular case, the basis for the post-traumatic stress disorder as defined in the literature is the captivity syndrome. The captivity syndrome is the underlying event that causes the post-traumatic stress disorder, what occurs to people in captivity.*" (emphasis added). Dr. Stock thereupon developed his logic in the following manner on direct examination:

Q. Well, isn't it true that you contemplate ... telling the jurors, if allowed to do so, that the so-called traumatic event occured?

*   *   *   *   *   *

A. No. What I am contemplating telling the jurors, if the allegations are true, that it is my opinion, based on information that I had available to me and my knowledge as an expert witness, that these individuals did indeed suffer the captivity syndrome. They suffered from captivity syndrome.

On cross-examination he proceeded:

Q. Despite the fact there is not literature on that subject at all through the second day of February of 1984 that you are aware of or have read?

A. No. There is a lot of literature about the *captivity syndrome.*

Q. In relation to individuals who supposedly are kept under the conditions which existed here?

A. Yes. In the sense it may not have been called involuntary servitude, but the conditions are analogous to other such happenings.

Q. What were the analogous conditions?

A. Well, Mr. Stringer went through the 11 points [Dr. Lifton's defined eleven essential elements underlying "captivity syndrome"]. If you would like, I'd be glad to go through it again.

Q. But those were all basically, were they not, where somebody was kidnaped or concentration camps or a prisoner of war camp?

A. That is right.

(emphasis added).

On further direct examination he elaborated:

Q. But you have examined these men and have an opinion as to whether or not they suffer a post-traumatic stress syndrome that would be consistent

with a captivity syndrome prior to the time you examined them; is that correct?

A. Yes. Based on my understanding of the scientific literature and my clinical experience in the area.

Q. In fact, they did suffer from the *captivity syndrome* and now, *post-traumatic stress syndrome*, that would have affected their psychological ability to leave or end the—to leave the environment that was causing this syndrome; is that correct?

A. Yes. It seems to me the bottom-line question is if people have an opportunity to escape when they are being held in any situation, why don't they? Captivity syndrome explains that.

THE COURT: Would you tell me how would you define the captivity syndrome?

THE WITNESS: The captivity syndrome, Your Honor, are psychological, are environmental manipulations that occur to make people's normal thinking, feeling and reactions.

(emphasis added).

Simply stated, Dr. Stock posited that Molitoris and Fulmer developed "captivity syndrome" as a result of the living conditions and treatment intentionally imposed upon them by the defendants which induced "post-traumatic stress disorder" that destroyed their will to voluntarily leave the farm and employ of the defendants, even though they were free to do so, thereby transforming them into "psychological hostages" bound to "involuntary servitude" for the defendants.[3] Dr. Stock further hypothecated that the "captivity syndrome," as discussed by Dr. Lifton in his published research of American prisoners held captive by the Chinese during the Korean war, and the "brainwashing" which induced "ideological conversion,"[4] were analogous to the techniques employed by the defendants in their continuing efforts to intentionally control Molitoris and Fulmer.

Even the most casual review, however, will disclose that the eleven criteria identified by Dr. Lifton as essential to the "brainwashing" implemented by the Chinese to achieve the thought control necessary to accomplish the "ideological conversion" characterized as "captivity syndrome" are patently incomparable with the living conditions and treatment to which Molitoris and Fulmer were exposed.

Initially, it should be noted that the "brainwashing" techniques employed by the Chinese as studied by Dr. Lifton were scientifically conceived, scientifically implemented, and scientifically monitored around the clock. The techniques were professionally structured into a planned, systematic, progressive program calculated to totally pervert and/or destroy an individual and to change his behavior and his beliefs. Essential to effective metamorphosis of the prisoner was an *environment of physical captivity, a realization of the futility of escape or rescue, and the use of force or the ever-present threat of force and even death.*

Only with an insight into the sophisticated techniques utilized by the Chinese in systematically phasing a captive through the stages described by Dr. Lifton's writings as essential to inducing "captivity syndrome" does the attempted correlation of Dr. Lifton's criteria to the living conditions and treatment to which Molitoris and Ful-

---

3. Direct examination of Dr. Stock:

Q. Do you have any explanation for their not leaving the farm where they were, the Kozminski farm?

A. Yes, on the surface, it appears that they had numerous opportunities to leave, and the question to me, interesting question, is why didn't they.

It's my opinion that they were psychological hostages, that even though they had the physical ability to get away from the farm, they were so tied to the farm that these [defendants] were their only caretakers, they became psychologically substituted parents for them. They could not form the requisite intent to escape. . . .

4. Although the record disclosed that the term "ideological conversion" refers to the efforts of the Chinese to influence the ideological beliefs of American captives with a view toward having them denounce the United States for propaganda purposes, the record does not reflect that the term bears any relationship to the term "involuntary conversion" as coined by Dr. Stock.

mer were exposed become incomprehensible.[5] The "brainwashing" discussed by Dr. Lifton involved total sensory deprivation. The prolonged confinement of the prisoner entailed total isolation in a room of limited space without access to any reference point and without hope of escape or rescue; time and all concept of time were eliminated; the prisoner was permitted to see no one but his guard; the prisoner slept only as permitted; he was permitted to hear only what he was intended to hear; he was spoken to only by his captors; he was physically humiliated; he had no toilet facilities; he was permitted no privacy when performing normal bodily functions; he was under around the clock surveillance by his guard; and *the prisoner was constantly placed in fear of his life.* The insidious procedure constituted a total assault on the individual personality calculated *to force* him to recant all of his personal and ide-

ological values and accept the values and beliefs of his captors.

In light of this comparative analysis, any attempt to equate the "brainwashing" practiced by the Chinese to induce Dr. Lifton's "captivity syndrome" with Dr. Stock's "involuntary conversion" and "psychological hostage" was, in the language of Dr. Emanuel Tanay,[6] "ridiculous" and an "invention of Stock." Dr. Robert Walsh,[7] characterized Dr. Stock's analogy as exceeding "sound professional practice and confused the issue."

On voir dire, Dr. Stock under cross-examination conceded:

Q. Now, sir, is there literature dealing with the subject matter of involuntary servitude as being equatable to involuntary conversion, that you are aware of:

A. Not that I am aware of.

Q. You know of none, right?

---

5. The essential elements for inducing the "captivity syndrome" as enumerated by Dr. Robert Lifton were:

(1) prolonged captivity; (2) continuous around the clock supervision, such as by guarding; (3) an isolated environment; (4) removal of all supports; (5) an attack on personality; (6) a lack of privacy; (7) assault upon the total personality; (8) a systematic use of reward and punishment; (9) a tearing of the fabric of the personality; (10) the building up of a new personality; and (11) ritualistic behavior, which was not considered by Dr. Stock in his analysis.

6. Dr. Emanuel Tanay is a graduate from the University of Munich, Germany, School of Medicine. He interned at Michael Reese Hospital in Chicago, Illinois; completed his psychiatric residency at Elgin State Hospital. He attended post-graduate school at the University of Michigan. He is licensed as a medical doctor by the State Medical Board of Michigan. He has a specialty in psychiatry and a sub-specialty in forensic psychiatry. He is a diplomat of the American Board of Psychiatry and Neurology and is certified as a specialist by the American Board of Psychiatry and Neurology and also acted on its Board of Examiners. He is a diplomat of the American Board of Forensic Psychiatry. He is a director of the Detroit Receiving Hospital, Department of Psychiatry. He enjoys staff privileges at all of the major hospitals in the Detroit area, including Beaumont, Harper, Grace, St. John, Sinai, and Cottege Hospital of Grosse Pointe. He is a member of the American Psychiatry Association, a Fellow of the American College of Forensic Sciences, a mem-

ber and past president of the Michigan Psychiatrists Society and a number of other professional organizations in the immediate geographic area. He has published in excess of seventy professional papers and has lectured to various law enforcement agencies as well as professional groups. He has conducted seminars involving forensic psychiatry throughout the country. He has appeared as a professional witness on behalf of the United States government in a number of criminal matters, i.e., the Jack Ruby investigation, the Garwood Vietnamese captive case, and the Theodore Bundy case. He has written professional papers—treaties on concentration camp survivors and captives of prisoner of war camps. He delivered a paper at an international symposium on the psychiatric aspects of captivity as well as captives of terrorists and hostage situations arising as a result thereof. Dr. Tanay is a friend of Dr. Lifton. He is presently a clinical professor of psychiatry at Wayne State Medical School.

7. Dr. Robert R. Walsh is a board-certified clinical psychologist licensed by the State of Michigan and an employee of the State Prison of Southern Michigan since 1974, where he exercises ultimate responsibility for virtually the total mental health care of approximately 5,000 prisoners residing in the central region of the Michigan Department of Corrections. He has a bachelor's and master's degree from Michigan State University and a doctoral degree from the University of Wisconsin at Madison, Wisconsin in Educational Psychology. He is familiar with Dr. Lifton's book as well as the entire spectrum of literature on the subject and is a scholar in the field.

A.  That's correct.

Both Doctors Tanay and Walsh confirmed that the terms "involuntary conversion" or "psychological hostage" could not be found in any psychiatric or psychological textbook or in any psychiatric or psychological literature.

Even Dr. Stock, in a colloquy with the court, stated:

THE COURT: ... but is captivity syndrome and involuntary conversion the same thing?

THE WITNESS: ... well, I guess it's not exactly the same thing.  If we look at a circle, the captivity syndrome is another circle.

The interrelationship of a "post-traumatic stress disorder" diagnosis with Dr. Stock's formulations is more difficult to comprehend.  It would appear that under Dr. Stock's reasoning, "in this particular case ... the post-traumatic stress disorder ... is the captivity syndrome."  Dr. Stock had previously equated the cause of "captivity syndrome" with the living conditions experienced by Molitoris and Fulmer at the defendants' farm.

There is no controversy between the parties as to a definition of post-traumatic stress disorder.  It is well-identified by Dr. Walsh:

It generally requires the individual to have been exposed to a very severe stressor, and the book is very clear in giving examples of this.  Survivors of the Nazi death camps is one example.  The victim of a very, very brutal rape or sexual assault could definitely be P.T.S., post-traumatic syndrome.  A victim of a national disaster such as a severe earthquake, tornado or a severe auto accident where they were incapacitated and possibly remained in the wreckage for a long time and in a state of semiconsciousness, this sort of thing is required initially.

Exposure to the stressor which has a delayed response on a person.  In the case of the Vietnam veterans, he may have returned back to the United States and to the perception of those around them, assimilated relatively normally and then all of a sudden something happens.

Quite often they re-experience the trauma or the stressor.

In the case of the Vietnam veteran it may be the backfiring of an automobile, it may be just a police helicopter or a regular helicopter just in earshot, throwing him back, psychologically back into that condition in the jungles of Vietnam.

\*    \*    \*    \*    \*    \*

These generally are considered to be a diminished capacity to respond in his or her environment.  The reoccurrence of the stimulus event or something remotely resembling it, like the whirring of a helicopter or the backfiring of a car, produces a very, very clear dramatic effect on the individual.

\*    \*    \*    \*    \*    \*

Again, this is the diagnostic criteria from the manual.  The first thing that is required is the existence of a recognizable stressor that would evoke significant symptoms of distress in almost everyone.

And again this is the type of stressor I've mentioned before, very severe, very life-threatening.  Generally the individual is in a situation where at least at some point during it they don't know if they are going to survive.  They are really faced with the imminent possibility of death and no control from their perceptual standpoint over it.

Re-experiencing of the trauma as evidenced by at least one of the following: One, recurrent and intrusive recollections of the event.  These are very vivid memories or re-experiencing of it, really.  As I mentioned before, the veteran walking down the street, for example, that he hears the whirring of a helicopter in the air.  Automatically, psychologically and mentally, at that point he is back in Nam.  He may start acting very erratically.  He may become very dangerous.

\*    \*    \*    \*    \*    \*

[T]here is a numbing of responsiveness to or reduced involvement with the external world beginning sometime after the trauma is shown by at least one of the following: One, markedly diminished in-

terest in one or more significant activities. Generally you have to know what the person's interests were before. They often withdraw. They may have had a hobby. They may have been good in some particular vocation. They are no longer interested in this, they don't do it. It's a very obvious sign to people around them, spouse, siblings, this sort of thing.

Two, feelings of detachment or estrangement from others. They don't feel part of society anymore, they feel different. They've had this experience. They don't feel close to other people. They feel alienated in a very real sense. You couldn't understand what they experience. You weren't through it, this sort of thing, so there is a tendency to pull away.

Three, constricted effect, which typically means that their emotional responsivity no longer runs the full range that we may experience from euphoria to extreme depression. It's in a much more limited range. It may very well be primarily depressive, and often is, in content. It may be planned. They are not spontaneous, I guess, is the best word. Spontaneous or full in the range of emotional responsivity that we would be.

I find no dispute among the parties that the essential stressor to a diagnosis of post-traumatic stress disorder is an immediate, obvious, severe, life-threatening incident over which the stressee/victim has no perceptual control. Typical examples cited in the literature are victims of the Nazi death camps; victims of an exceptionally brutal rape or sexual assault or other violent criminal act; victims of a severe natural disaster such as a violent earthquake, tornado, flood or fire, or other catastrophe; airplane or automobile disasters; bombing; and torture. None of such occurrences are disclosed by the facts depicting the living conditions to which Molitoris and Fulmer were exposed.

With this as background, I am constrained to re-examine Dr. Stock's opinion [8] in an effort to give some fabric to his testimony.

His examination reflects the following dialogue:

Q. But you have examined these men and have an opinion as to whether or not they suffered a post-traumatic stress syndrome that would be consistent with a captivity syndrome prior to the time you examined them; is that correct?

A. Yes. Based on my understanding of the scientific literature and my clinical experience in the area.

Q. In fact, they did suffer from that captivity syndrome and, now, post-traumatic stress syndrome, that would have affected their psychological ability to leave or end the—to leave the environment that was causing this syndrome; is that correct?

A. Yes. It seems to me the bottom-line question is if people have an opportunity to escape when they are being held in any situation, why don't they? Captivity syndrome explains that.

He proceeded to develop his logic by stating in response to the court:

THE COURT: What do you describe as the condition that you would define as the captivity syndrome?

THE WITNESS: The condition is the breaking down of free will, of conscious and volitional choice.

THE COURT: And its relevance in this case is what, as you understand it?

THE WITNESS: Explaining why if these people had opportunities to walk way [sic], why they did not.

Upon further examination by the court, Dr. Stock responded:

---

**8.** The essence of Dr. Stock's diagnosis of "post-traumatic stress disorder" was, I presume, to provide substance for his conclusion that both Molitoris and Fulmer, as a result of their living conditions, were so traumatized that they lost their will to voluntarily leave the farm. His expressed conclusion appears to be contradictory in light of his concession to the court that his reports reflected no diagnosis of "post-traumatic stress disorder." Both Drs. Tanay and Walsh also ruled out the diagnosis.

Q. There is no place in your report ... that post-traumatic disorder, either chronic or delayed, exists in this case, is that correct?

A. That's correct.

Upon further examination he conceded that the collapse of the captives' will, as described by Dr. Lifton, was not a criterion for a diagnosis of post-traumatic stress disorder:

Q. Where under post-traumatic stress disorder does it say the breaking down of will is part of the criteria, that is what you told the Court?

A. I would include that under the death camps, concentration camps, prisoner of war.

* * * * * *

Q. *I'm asking you is that listed in the criteria?*

A. *The breaking down, specifically, no, it's not.*

(emphasis added).

Dr. Stock, in a purely conclusory manner, thereafter summarized his rationale, after going full circle, by restating his scientifically unsupported thesis that, although the "captivity syndrome" was anchored in forcible physical confinement and was not equatable to the living conditions experienced by Molitoris and Fulmer, and the facts of those living conditions would not support the diagnosis of "post-traumatic stress disorder," it was nevertheless his opinion that both Molitoris and Fulmer were "psychological hostages" who had no will to leave the defendants' farm and were therefore bound to "involuntary servitude":

Q. Doctor, the basis of your opinion, ... you have assumed all of the facts as true, is that correct, that have been related to you?

A. Yes. It's my feelings if they were, if they were true, then, this is what occurred.

Q. And you have literally in your eleven points [Dr. Lifton's defined eleven elements essential to rendering "captivity syndrome"], if you just take

number one, concluded, which is a conclusion, that captivity exists?

A. Yes, in the *psychological sense.*

(emphasis added).

It is true, as the dissent appears to opine, that "captivity syndrome" is well documented in psychological literature; however, recognition of "captivity syndrome" as a generally accepted theory within the particular field to which it belongs is not at issue in this appeal. At issue is the correlation/equation or lack thereof between "captivity syndrome" and "psychologically induced involuntary servitude." It is this lack of correlation/equation between the two inconsistent theories that has been the thrust of defendants' argument before the trial court and here on appeal. It is the absence of *any* peer recognition, validation, or acceptance of a correlation between the two theories in literature, research, or otherwise that supports the defendants' assignments of error.

It is also true that the defendants challenged Dr. Stock's terminology of "involuntary conversion"; however, the challenge transcends the isolated phrase. The defendants challenged the application of the term as a catalyst for Dr. Stock's unsupported assertions of "psychologically induced involuntary servitude" or a "psychological hostage" situation. It is the transition from a forceful *physical* confinement and systematic coercive environment calculated to induce "ideological conversion," which is the essential predicate for "captivity syndrome," to *psychologically* induced involuntary servitude in a environment free of forceful physical confinement or psychological coercion that gives rise to the defendants' exceptions.

The dissent would bridge the vital gap, although Dr. Stock was unable to do so, by characterizing Dr. Stock's use of the term involuntary conversion as merely a description to convey the recognized effects of the captivity syndrome. However characterized, Dr. Stock's expressions to the jury, intended as ostensibly expert opinion predicated upon sufficiently established professional principles and as having gained general acceptance in the particular field to

which it belonged, stand naked and ignored by his peers and find support only in this initial airing of his own personally tailored theory.[9]

The dissent again misconstrues the issues on appeal when it urges that, since the defendants elected to present two experts who contradicted Dr. Stock's analogy of the "captivity syndrome," it was for the jury to evaluate the weight of the evidence. *The weight of the evidence is not in question;* the threshold issue is the *admissibility* of the evidence that must be initially addressed. *Brown,* 557 F.2d at 556, addressed the issue thusly:

> Conflicting testimony concerning the conclusions drawn by experts, *so long as they are based on a generally accepted and reliable scientific principle,* ordinarily go to the weight of the testimony rather than to its admissibility.

(emphasis added). The language presumes a competent expert witness and testimony which is based upon demonstrated reliable principles which have been sufficiently established to have gained general acceptance in the particular field to which they belong.

In sum, this case represents a classical example of the manner in which expert testimony, admitted without proper foundation, can confuse or mislead the trier of fact and thereby defeat a defendant's right to a fair trial. Without doubt, Dr. Stock's opinion conveyed apparent objectivity as is evident from the jury's verdict. His ob-

stensibly scientific theory carried undue weight with the trier of fact and precluded effective response beyond an ineffective general denial. Since Dr. Stock's theory had received no exposure among his peers, qualified persons had no opportunity to either validate Dr. Stock's results or criticize the means by which he reached his opinions. Thus, paraphrasing the admonition of *Brown,* 557 F.2d at 556, *the courtroom in the present case was a research laboratory. The fate of the defendants in this criminal prosecution rested on their ability to successfully rebut scientific evidence which had an "aura of special reliability and trustworthiness,"* although in reality, Dr. Stock was testifying to an unproved hypothesis in an isolated experiment which had not gained general acceptance in its field.[10]

I would therefore reaffirm the sound pronouncements by this circuit in *Green, Brown,* and *Brady* and reverse the trial court on this issue.

The competency of Dr. Stock to testify as an expert witness was placed in issue by the government and the court as demonstrated by the following dialogue:

> Ms. Morgan [government counsel]: Your Honor, we would offer Dr. Stock as an expert in the field of Forensic Psychiatry and offer his expert testimony to the Jury.
>
> THE COURT: I don't pass on qualifications, it's up to the jury. Go ahead and interrogate him.

---

**9.** This was the first time that he testified to his theories: "this is my first case of involuntary servitude."

**10.** It would appear that the dissent would overrule overwhelming legal precedent in this circuit and throughout the nation that recognizes the necessity for a strong countervailing restraint on the admission of expert testimony to protect a defendant's right to a fair trial.

After recognizing that:

> There are good reasons why not every ostensibly scientific technique should be recognized as the basis for expert testimony. Because of its apparent objectivity, an opinion that claims a scientific basis is *apt to carry undue weight with the trier of fact.* In addition, *it is difficult to rebut such an opinion except by other experts or by cross-examination* based on a thorough acquaintance with

the underlying principles. In order to prevent deception or mistake and to allow the *possibility of effective response, there must be a demonstrable, objective procedure for reaching the opinion and qualified persons who can either duplicate the result or criticize the means by which it was reached,* drawing their own conclusions from the underlying facts. *Brown,* 557 F.2d at 556 (emphasis added). The dissent disregards the admonition with the observation that the "defense produced two experts who differed with and effectively criticized Dr. Stock's testimony."

It is true that after the trial court erroneously admitted Dr. Stock's highly prejudicial testimony, the defendants presented two experts to contradict Dr. Stock's opinions; however, they had no alternative after the court permitted him to testify.

Initially it should be noted that Dr. Stock was offered "as an expert in the field of Forensic Psychiatry." Dr. Stock was neither a medical doctor nor was he qualified in the specialty of psychiatry, let alone in the field of forensic psychiatry. This alone should have made his competency suspect.

The trial court obviously abdicated its mandatory duty to pass upon the competency of a witness offered as an expert. The dissent would dismiss this refusal to act by citing to defense counsel's failure to object. The reliance is misplaced.

The salient purpose for entering an objection during trial is to alert the trial court to an issue which demands its attention and to record for appellate review the court's disposition thereof. The record here has concisely preserved the issue for appropriate review. After the court disposed of the objection, counsel were thereafter obliged to abide by the ruling and to proceed with the trial of the action. *Maness v. Meyers,* 419 U.S. 449, 459, 95 S.Ct. 584, 591, 42 L.Ed.2d 574 (1975).

This court has construed Fed.R.Evid. 702 to permit the admission of expert testimony only when it is presented by (1) a qualified expert; (2) testifying on a proper subject; (3) in conformity to a general accepted explanatory theory; (4) the probative value of which outweighs any prejudicial effect. *Green,* 548 F.2d at 1268. The appellants have also charged the trial court with error in permitting the government's expert to testify and to express opinions contrary to the first mandate of *Green. Green,* 548 F.2d at 1268, paraphrases Fed. R.Evid. 702 as follows:

> To permit expert testimony to be heard by the jury, *the trial court must first determine* whether the specialized knowledge involved "will assist the trier of fact to understand the [other] evidence or to determine a fact in issue." Then *it* must satisfy *itself* that the proffered *witness* is "qualified as an expert by knowledge, skill, experience, or education ..." *Appellate review of such sensitive discriminations by lower*

> *courts may only be rationally accomplished on an ad hoc basis.*

(emphasis added).

The non-delegable duty is, as a matter of law, placed squarely upon the shoulders of the trial judge. Stated differently, competency of a witness to testify is for the judge to decide while credibility of the witness is left to the jury. *United States v. Barnard,* 490 F.2d 907, 912 (9th Cir.1973), *cert. denied,* 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974). Expert testimony is admissible only when the witness is in fact an expert and is accepted as such by the court. *United States v. Amaral,* 488 F.2d 1148, 1153 (9th Cir.1973). Meaningful implementation of this mandate by the trial court has historically afforded the accused the protection against the prejudicial impact of opinion evidence clothed with the weight of expertise, which gave rise to the rule, and allayed the apprehensions voiced in *Amaral* and *Green* and echoed by their progeny. Abdication of the duty by the trial judge is plain error.

The dissent recognizes, but seeks to avoid, the error charged by the defendants by stating in essence that, with regard to the first criterion, the defendants did not argue that Dr. Stock was not a qualified expert; they simply argued that the district court failed to find that he was a qualified expert. I cannot agree with that conclusion. The argument presented in defendants' briefs and before this court belies that formulation. Defendants clearly contested both Dr. Stock's competency as an expert and the trial court's refusal to consider and pass upon that competency when the facts of his expertise demanded a court ruling. More specifically, defendants challenged Dr. Stock's competency to extrapolate a "psychologically induced involuntary servitude" or a "psychological hostage" situation in an environment free of forceful physical confinement and/or systematic psychological coercion from a forceful physical confinement and environment coupled with insidious coercive psychological treatment calculated to induce "ideological conversion," which is the preconceived predicate for "captivity syndrome" as discussed by Dr. Lifton. In sum, defendants

objected to Dr. Stock's competency to formulate and testify to a thesis of first psychiatric/psychological impression which has its basis in an unproved hypothesis derived for an isolated purpose and which has no acceptance in the scientific field to which it belongs.

An examination of Dr. Stock's credentials [11] reflected academic training in the diagnosis and treatment of disturbed children and neurologically impaired children. He had extensive experience in testing and evaluating children and adolescents who were mentally retarded. He was familiar with the literature in the field of psychiatry characterized as "victimization," which he defines as dealing with victims of rape and other violent crimes, terrorism including hostage-taking, and natural disasters. His knowledge of "captivity syndrome" resulted from reading Dr. Lifton's book.

The defendants have not questioned Dr. Stock's competency to administer individual intelligence tests or personality assessment tests, to conduct group testing, and to interpret and evaluate individual mental retardation levels, the extent of the examination that he conducted of Fulmer and Molitoris that was described as extensive in the dissent. Defendants have taken no exception to his opinions concerning the mental retardation levels of Molitoris or Fulmer.

All of the foregoing practices and procedures were well within the area of his expertise and training. His experience and training in the area of testing, interpreting, and evaluating levels of retardation did not, however, qualify him as an expert in the unrelated field discussed in Dr. Lifton's book. Moreover, absent any correlation in the record between "terrorism" including "hostage-taking" and Dr. Lifton's "captivity syndrome," Dr. Stock's experience in the area of "terrorism" lends no weight to his qualifications to advance a theory beyond his expertise which had not received recognition, validation, or general acceptance in the field to which it belonged.[12]

In light of Dr. Stock's questionable credentials and his highly convoluted and often confusing and contradictory testimony, the trial court, at the very least, had a duty to protect the defendants' right to a fair trial by exercising its mandatory duty to rule on Dr. Stock's competency to appear as an expert witness. Abdication of this duty by the trial court constituted plain error. I would therefore also reverse the trial court on this issue.

Accordingly, it would appear that the record herein does not support the hypotheses upon which the dissent relies.

11. The record disclosed that Dr. Stock's academic credentials included a Bachelor of Arts degree in psychology from the University of Florida in Emotionally Disturbed Children; a Master of Science degree in Clinical Psychology from Emporia State University and a Doctorate in Psychology from the University of Kansas in Neurologically Impaired Children. Dr. Stock was a fully licensed psychologist in the State of Michigan. He was not board certified in any area or specialty. He participated in an internship at the Department of Psychiatry at Rutgers Medical School. He was an Adjunct Professor of Psychology at Trenton State College and in 1977 undertook employment at the Center for Forensic Psychiatry in Ypsilanti, Michigan. He listed no hospital privileges. He has lectured at the Special Operations Research Section of the FBI Academy at Quantico, Virginia on International Terrorism and Hostage Negotiations and at the United States Secret Service Academy in Washington, D.C. on Interview Interrogation and Threat Analysis to the President. He was an instructor at the Jackson Community College Police Academy and the Criminal Justice Training Center in Ohio in the field of Hostage Taking and Hostage Negotiations. He has presented papers at the American Psychological Association in Washington, D.C. on the Technology of Terrorism and Psychological Consulation to Police Agencies. He wrote a paper for the Journal of Psychiatry on the subject of the Law on Competency to Stand Trial. Dr. Stock characterized his practice in the following terms:

In my capacity as a psychologist I work with numerous individuals, children, and adolescents who are mentally retarded and in my work at the Forensic Center I have evaluated and treated individuals who were mentally retarded.

12. The record does not demonstrate any interplay or interrelationship between "hostage-taking" and Dr. Stock's "involuntary conversion" "psychological hostage" thesis. The conditions associated with "hostage-taking" were characterized as the "Stockholm Syndrome" by Dr. Stock. The record also fails to disclose any analogy between the eleven points of Dr. Lifton's "captivity syndrome" and the criteria that induces "Stockholm Syndrome."

KEITH, Circuit Judge, dissenting.

I concur in Judge Guy's well-reasoned dissenting opinion. However, I write separately to highlight some of my concerns about this case. I feel that the majority opinion unduly restricts the scope of 18 U.S.C. § 1584. Judge Guy correctly states that fraud and deceit are not the only ways to subjugate the will of another. Also, limiting the class of victims to minors, immigrants and mental incompetents is underinclusive and without merit.

I am especially disturbed with the majority's treatment of the expert testimony issue. I think that the majority's reliance of the factors in *United States v. Green*, 548 F.2d 1261 (6th Cir.1977), is misplaced. The *Green* analysis should be limited to determining the admissibility of *scientific* evidence. In this case, the testimony of Dr. Stock was based on his clinical findings, not on an esoteric theory.

Based on the above, I think the Court is committing an egregious error in the position that it has taken.

RALPH B. GUY, Jr., Circuit Judge, dissenting, joined by LIVELY, Chief Judge, and BOYCE F. MARTIN and NATHANIEL R. JONES, Circuit Judges.

I respectfully dissent from the majority's conclusions in both part II and part III of the opinion.

## I.

It is clear that 18 U.S.C. § 1584 is lacking in definitional precision when it makes criminal the holding of one in "involuntary servitude." Whether this is the genius of this section or a deficiency to be cured by judicial legislation is not so clear. The majority apparently concludes it is a deficiency and proceeds to cure it by substituting an arbitrary definition that raises more questions than it answers. In discussing this specific section, Judge Dimock, who concurred in *Shackney*, prophetically wrote:

To have an arbitrary classification which will resolve with equal facility all of the cases that would arise under the statute is indeed a tempting prospect. It is much harder to have to work under a statute which will raise difficult questions in the borderline cases inevitable whenever the application of a statute depends upon an appraisal of the state of the human mind.

333 F.2d at 488.

The problem with the definition offered by the majority is that it not only unduly focuses on the means of accomplishing involuntary servitude, but also, at least as to its third prong, would define and *limit* the classes of persons to whom it applies. I see no necessity for the former and no justification for the latter.

Whenever one attempts to define by setting out the *means* of accomplishment the risk of underinclusion is considerable. What is needed is a definition of "involuntary servitude" not a listing of examples of how it may be accomplished. I would offer as an acceptable definition, at least for "involuntary," that suggested in the concurring opinion in *Shackney:* "Where the subjugation of the will of the servant is so complete as to render him incapable of making a rational choice, the servitude is involuntary...." *Id.* at 488. It goes without saying that since this is a criminal statute, the master would, of course, have had to intend this result.[1]

The "fraud and deceit" prong of the majority's test apparently is the creation of the majority as is the limiting of the classes to whom it is to apply. Prongs (1) and (2) of the proposed test—physical force and legal coercion—are the slavery and peonage tests. "Fraud and deceit," however, are not terms of art in the arena of involuntary servitude cases and would seem to cover an almost limitless range of conduct. Since I write in support of a more flexible definition than that offered by the majority, it is not the breadth of the proposed definition that is troubling. I simply see no

---

1. I think that the legislative history utilized by the majority is more helpful on the question of what "servitude" means. I would concur that the servitude contemplated is of a type associated with slavery and peonage.

need to specifically reference "fraud and deceit" to the exclusion of other means. I would agree that fraud and deceit, in addition to physical force and legal coercion, are ways of subjugating the will of another—but they are certainly not the only ways, nor are they necessarily the most egregious.

I am also puzzled as to why the "fraud and deceit" exception, if there is to be one, should be limited in its application to minors, immigrants, and mental incompetents. Where it is necessary to resort to The Restatement (Second) on Contracts to interpret a criminal involuntary servitude statute, I become concerned that revision, not interpretation, is underway. Furthermore, the inclusion of "immigrants" as a special class cannot be supported by reference to the *Padrone* statute as the majority suggests. As the appendix to the majority opinion itself indicates, the antecedent statutes reference "any person inveigled or forcibly kidnapped in any other country, with intent to hold such person so inveigled or kidnapped in confinement or to any involuntary service...." This is hardly the definition of an immigrant.

I would offer as the final evidence in support of the proposition that the majority's new definition causes more problems than it cures the fact that, when it is applied to the instant case, the result is a remand for a retrial on the fraud and deceit theory even after the majority rules out Dr. Stock's testimony. Although I would affirm the original conviction, I nonetheless find it strange and unsettling to send a criminal case of this nature back for a retrial on a theory never advocated by the government or defended against by the defendants in the first trial.

This is not an easy definitional question and it is one on which reasonable minds and federal circuits might differ. I write in dissent, however, primarily because I believe the majority has rewritten rather than interpreted 18 U.S.C. § 1584.

**2.** It is not clear from the majority opinion whether the *foundational* problems that they

## II.

I have even greater concern for the *ramifications* of part III of the majority's decision than I do part II. This concern is predicated, at least in part, by the frequency with which courts deal with these problems. Involuntary servitude cases are few and far between, whereas cases in which experts testify are a daily occurrence.

Due to what the record tells us about the condition of the victims of this alleged crime and how traumatic the trial was for them, I doubt very much that there will ever be a retrial pursuant to our remand. Even if there is, I do not consider it a matter of global significance whether Dr. Stock is allowed to testify or not.[2] However, I am concerned about the rationale used for the exclusion of this evidence being used in other cases. As I will develop further, *infra*, I submit that our decision in *United States v. Green,* 548 F.2d 1261 (6th Cir.1977), on which the majority *wholly* relies, should be clarified if not overruled by this *en banc* court—not extended.

### A.

The majority cites *United States v. Green,* 548 F.2d 1261 (6th Cir.1977), as setting forth the standards to be applied in determining the admissibility of expert testimony. Green, convicted of conspiracy to manufacture a controlled substance, Dimethyltryptomine, challenged expert testimony admitted at trial. First, he challenged the testimony of a chemist from the Food and Drug Administration who testified, among other things, as to the threat posed by the drug, its effects upon the body, the procedure by which it may have been classified as a controlled substance, and its relationship to LSD. Second, Green challenged the testimony of a DEA agent who testified as to the number of dosage units which were theoretically manufacturable from the chemicals found, the anticipated purity of the final product, the street price of a dosage unit, and the details of other illegal drug transactions that had no relation to the defendant. *Id.* at 1264–65.

find mandate exclusion of Dr. Stock's testimony are correctible in a second trial.

Significantly, the *Green* court first noted that Fed.R.Evid. 702 set forth the test for admissibility of expert testimony. 548 F.2d at 1268. Nevertheless, the court found Rule 702 deficient when applied to criminal cases, in that it failed to include among the factors to be balanced by the trial court the potential prejudicial impact of the expert testimony upon the substantial rights of the accused. *Id.* Consequently, relying on *United States v. Amaral*, 488 F.2d 1148, 1153 (9th Cir.1973), the court adopted "for use in criminal appeals the four criteria proposed in *Amaral* for review of trial court decisions concerning expert testimony: '1. qualified expert; 2. proper subject; 3. conformity to a generally accepted explanatory theory; and 4. probative value compared to prejudicial effect.'" *Id.*[3]

To the extent that the *Green* court suggested that its test must be applied to *all* expert testimony in criminal cases, such holding is clearly inconsistent with common practice. To the contrary, many types of expert testimony are regularly received in criminal cases without resort to standards such as those set forth in *Green*. *Green* describes the type of test courts generally employ when analyzing the admissibility of *scientific* evidence. To my mind, there is a difference between the type of scientific testimony to which such a test is normally applied, and the expert testimony of a clinical psychologist like Dr. Stock.

Dr. Stock did not simply take two individuals, whom he had never met or spoken to, and based on a set of known facts attempt to fit them into a theory. Rather, he extensively interviewed Fulmer and Molitoris, performed a battery of psychological tests, reviewed medical histories, and acquainted himself with the circumstances under which they lived. Dr. Stock testified that his opinion was derived from his clinical evaluation of the two men, including the objective tests he administered, as well as his experience in this field and the accepted theory of involuntary conversion. As a

result, Dr. Stock's testimony is no different than the *clinical assessments* of psychologists and physicians regularly received by trial courts. I am unable to distinguish this type of testimony from, for example, that of a psychologist or psychiatrist testifying on the issue of a criminal defendant's sanity. Essentially, Dr. Stock testified, after careful examination of the individuals as well as the background facts, that the victims' wills were overborne. This is neither novel theory nor outside the general area of expertise of a psychologist or psychiatrist. It is certainly not the application of a scientific test.

The majority assumes that opinion testimony offered like that of Dr. Stock's must be submitted to the *Green* test for scientific evidence. Yet, the rationale for such a test, as explained by this court in *United States v. Brown*, 557 F.2d 541 (6th Cir. 1977), does not support such a conclusion:

"There are good reasons why not every ostensibly scientific technique should be recognized as the basis for expert testimony. Because of its apparent objectivity, an opinion that claims a scientific basis is apt to carry undue weight with the trier of fact. In addition, it is difficult to rebut such an opinion except by other experts or by cross-examination based on a thorough acquaintance with the underlying principles. In order to prevent deception or mistake and to allow the possibility of effective response, there must be a demonstrable, objective procedure for reaching the opinion and qualified persons who can either duplicate the result or criticize the means by which it was reached, drawing their own conclusions from the underlying facts."

557 F.2d at 556 (quoting *United States v. Baller*, 519 F.2d 463, 466 (4th Cir.), *cert. denied*, 423 U.S. 1019, 96 S.Ct. 456, 46 L.Ed.2d 391 (1975)).

This statement indicates the two traditional concerns involved with scientific tes-

---

**3.** It is not readily understandable why the *Green* court found it necessary to adopt any special test for the admissibility of expert testimony in criminal cases. In finding that the trial court erred in admitting the testimony, the court con-

cluded that the testimony was irrelevant and prejudicial, determinations commonly made under Fed.R.Evid. 401 and 403. Even more significant is the fact that *Amaral* was decided *before* the Federal Rules of Evidence were adopted.

timony: (1) that objective scientific testimony will bear an "aura of special reliability and trustworthiness," *Brown*, 557 F.2d at 556, and (2) that a "minimal reserve of experts exist who can critically examine the validity of a scientific determination in a particular case," *United States v. Addison*, 498 F.2d 741, 744 (D.C.Cir.1974). Neither of these concerns is implicated by the testimony of Dr. Stock.

Dr. Stock's testimony on the state of mind of the victims was not predicated on a scientific technique but on the type of subjective analysis that a clinical psychologist is trained to perform. In a recent case, the California Supreme Court rejected the argument that expert psychological testimony should be subject to the same test as scientific testimony:

> It is important to distinguish in this regard between expert testimony and scientific evidence. When a witness gives his personal opinion on the stand—even if he qualifies as an expert—the jurors may temper their acceptance of his testimony with a healthy skepticism born of their knowledge that all human beings are fallible. But the opposite may be true when the evidence is produced by a machine: like many laypersons, jurors tend to ascribe an inordinately high degree of certainty to proof derived from an apparently "scientific" mechanism, instrument or procedure. Yet the aura of infallibility that often surrounds such evidence may well conceal the fact that it remains experimental and tentative.

\* \* \* \* \* \*

Here, by contrast, no such methods are in issue. We have never applied the *Kelly-Frye* rule to expert medical testimony, even when the witness is a psychiatrist and the subject matter is as esoteric as the reconstitution of a past state of mind or the prediction of future dangerousness, or even the diagnosis of an unusual form of mental illness not listed in the diagnostic manual of the American Psychiatric Association....

*People v. McDonald*, 37 Cal.3d 351, 690 P.2d 709, 723–24, 208 Cal.Rptr. 236, 250–51 (1984) (permitting expert psychological testimony on eyewitness identification). *See also United States v. Metzger*, 778 F.2d 1195 (6th Cir.1985) (expert opinion as to cause of explosion based in part on comparison between actual explosion and demonstration does not claim a "scientific basis," but falls more properly within "other specialized knowledge" category of Fed.R. Evid. 702; as such, it does not carry with it any "aura" of special reliability and general acceptance in the particular field is not required).

Likewise, the second concern, relative to whether experts exist who can effectively refute the scientific evidence being admitted, is not relevant. Here, the defense produced two experts who differed with and effectively criticized Dr. Stock's testimony. The defense was not prejudiced by being unable to locate experts to respond to Dr. Stock's testimony.[4]

Moreover, to the extent that the *Brown* court suggested that it is somehow unfair to burden the defendant with the necessity of obtaining experts to rebut the prosecution's case, or to gain a thorough acquaintance with the underlying principles of the expert's testimony, such a suggestion was explicitly rejected by the Federal Rules of Evidence. *See* Notes of Advisory Committee to Fed.R.Evid. 705 (rule "assumes that the cross-examiner has the advance knowledge which is essential for effective cross-examination").

The *Green* test is actually derivative of *Frye v. United States*, 293 F. 1013 (D.C. Cir.1923). *But see infra* Part C. It is therefore noteworthy that the court which first introduced the *Frye* standard for testing the admissibility of novel scientific evidence has stated that the standard applies to "questions of admissibility of expert testimony based on new methods of *scientific*

---

**4.** It appears clear from the record that the government knew it would have to present testimony on the victims' state of mind in a case where there was an obvious lack of physical restraint present. The defense was always aware of this and prepared accordingly.

*measurement....*" *United States v. Addison*, 498 F.2d at 743 (emphasis added).[5]

The concerns contemplated by the *Green-Frye* test can be adequately addressed by Rule 403 in these circumstances. For instance, the unwarranted "aura of reliability" that may surround the evidence may be assessed by its tendency, if any, to mislead the jury. *United States v. Downing*, 753 F.2d 1224, 1239 (3d Cir. 1985); *see also* McCormick, Handbook of the Law of Evidence § 203 at 608–09 (3d ed. 1984).[6] And to the extent that the *Green-Frye* standard works to assure the availability of more than one expert on the topic involved, that value can be preserved under the Federal Rules of Evidence as well. Courts may consider the availability of experts to evaluate the evidence in determining whether undue prejudice might result from its admission.

Since we are considering this case *en banc*, it would be an appropriate time to reconsider the premise in *Green* that expert testimony in criminal cases should be judged by a different standard than in civil cases. This result is certainly not dictated by the Federal Rules of Evidence which were relatively new at the time *Green* was decided. It appears to me that the fact that a jury, after consideration of all the evidence, including any expert opinions allowed into evidence, must find the defendant guilty beyond a reasonable doubt is all the differentiation that is necessary or called for.

**B.**

Assuming, however, that the majority is correct in going on to apply the four part test of *Green*, the first inquiry is whether the expert is qualified. No one here has challenged the qualifications of Dr. Stock, and in fact, he appears eminently qualified to offer an opinion on the victims' state of mind.[7] The second element, whether the subject is a proper one for expert testimony, has been implicitly answered by this court's definition of involuntary servitude. The first prong of the majority's test is that "the servant believes that he or she has no viable alternative but to perform service for the master." Consequently, the servant's state of mind is a crucial factor in this formula. The majority has, however, undercut its adoption of this standard with its conclusion that the type of expert testimony offered here on the victims' state of mind is inadmissible. If the proposition is accepted that something less than actual physical restraint can result in violation of the statute prohibiting involuntary servitude, particularly in the case of a victim who is mentally incompetent and may thus become an involuntary servant by virtue of the master's deceit or fraud, then any qualified psychiatrist or psychologist should be able to testify that in a particular instance the will of the victim was overborne to the point that his service was involuntary.

The third inquiry is, of course, the crucial one here; that is, whether the testimony is in "conformity with a generally accepted explanatory theory." 548 F.2d at 1268. As stated above, this element has its genesis in *Frye*. At the same time, it has undergone a subtle but important change.

The court in *Frye* held:

Just when a scientific principle or discovery crosses the line between the ex-

---

**5.** The *Frye* test has been the subject of vigorous criticism. *See United States v. Downing*, 753 F.2d 1224, 1235–37 (3d Cir.1985), and authorities cited therein. The courts that have moved away from *Frye* have adopted a reliability test. *See Downing*, 753 F.2d at 1238 (relying in part on this court's opinion in *United States v. Franks*, 511 F.2d 25, 33 n. 12 (6th Cir.), *cert. denied*, 422 U.S. 1042, 95 S.Ct. 2656, 43 L.Ed.2d 693 (1975)); 3 J. Weinstein & M. Berger, *Weinstein's Evidence* § 702[03] at 702–18 to 702–20; *United States v. Williams*, 583 F.2d 1194 (2d Cir.1978), *cert. denied*, 439 U.S. 1117, 99 S.Ct. 1025, 59 L.Ed.2d 77 (1979).

**6.** Jury instructions are also a tool for dispelling an unwarranted aura of reliability, as jurors are usually instructed, as they were here, that they should give an expert's opinion only such weight as they think it deserves, and should reject it if they "conclude that the reasons given in support of the opinion are not sound." (App. 154.)

**7.** By "qualified" I mean to suggest more than just paper credentials. Here, Dr. Stock had worked with the victims and conducted extensive testing. He was completely familiar with their long period of servitude and the circumstances surrounding it.

perimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained *general acceptance in the particular field in which it belongs.*

293 F. at 1014 (emphasis added). "General acceptance in the particular field in which it belongs" is the criterion still widely applied today. Yet in *Green,* this standard has become "conformity to a generally accepted explanatory theory." The distinction is important because in *Frye* the emphasis was placed upon the technique or methodology employed to reach a result, yet in *Green* the focus has been transferred to the theory. In other words, rather than assessing the "thing from which the deduction is made," we have focused on the deduction itself.

When adopting the *Green* test, the court relied on *United States v. Amaral,* 488 F.2d at 1152, where the Ninth Circuit stated: "Because of the peculiar risks of expert testimony, courts have imposed an additional test, i.e., that the testimony be in accordance with a generally accepted explanatory theory." In support of this characterization, the Ninth Circuit cited *Frye* and *United States v. Stifel,* 433 F.2d 431 (6th Cir.1970), *cert. denied,* 401 U.S. 994, 91 S.Ct. 1232, 28 L.Ed.2d 531 (1971). *Stifel* correctly sets forth the language used in *Frye,* 433 F.2d at 438, 441 (record affords support for the proposition that neutron activation analysis has gained "general acceptance in the particular field in which it belongs"). The Ninth Circuit has never cited *Amaral* for "conformity to a generally accepted explanatory theory." [8]

In applying this factor, the majority concludes that Dr. Stock's testimony is inadmissible because a foundation was not laid to establish its conformity to a generally accepted explanatory theory. In arriving at this conclusion, the court relies on the testimony of defendants' experts who criticized Dr. Stock's theory. In addition, the majority, after listing the elements of captivity syndrome, determines that the facts presented at trial do not support the existence of these factors. Accordingly, the court holds that captivity syndrome is inapplicable as a matter of law.

While this type of analysis may be compelled by the *Green* formula, I have serious concerns with it. The majority frames the evidentiary inquiry as whether Dr. Stock's theory of involuntary conversion as applied to this case is in conformity with captivity syndrome. It is unclear why Dr. Stock's theory must completely track captivity syndrome. If the court is saying that involuntary conversion must have gained general acceptance in the particular field in which it belongs, and the field is captivity syndrome, the basis for making that conclusion has not been specified. The only field involved here is psychology or psychiatry. The only testimony as to what class of experts would be qualified to express an opinion on these issues was Dr. Stock's testimony that forensic psychiatrists or psychologists would have such expertise (App.75).

After determining that Dr. Stock's theory must be in conformity with captivity syndrome, the majority concludes it is not by relying on the testimony of the other experts. In other words, the court found the defense experts to be more believable and has determined the admissibility of Dr. Stock's testimony based on a credibility finding. This weighing of testimony clearly usurps the function of the jury in deciding which expert, if any, should be believed.[9]

---

**8.** In fact, the Ninth Circuit has apparently adopted a "reliability" standard. *See United States v. Gwaltney,* 790 F.2d 1378, 1382 (9th Cir.1986) (proponent of scientific evidence has burden of laying a proper foundation showing the underlying scientific basis and reliability of the expert's testimony); *Brown v. Darcy,* 783 F.2d 1389, 1396 (9th Cir.1986).

**9.** As stated by the court in *Ibn-Tamas v. United States,* 407 A.2d 626 (D.C.App.1979):

Next, the court determines that captivity syndrome is inapplicable based on the facts of this case. Yet, during trial, there was testimony on many, if not all, of the ten elements of captivity syndrome.[10] It is my understanding that the jury determines whether or not the facts which are necessary to validate an expert's opinion are present.

The majority interpretation raises, in turn, the question of what "conformity" to a generally accepted theory means. The court concludes that because the "captivity" here differs from the type of restraint present in the classic captivity syndrome case, Dr. Stock's theory is not in conformity with captivity syndrome. This presents a problem because Dr. Stock testified that not all elements of captivity syndrome would have to be present and that captivity syndrome would have a reliability of a low probability of applicability to a high probability of applicability depending on the environmental restrictions, constraints, and manipulations that were conveyed. Essentially, the court has itself determined that there is a low probability of applicability because it has concluded from the facts presented at trial that the environmental restrictions here differed from that of classic captivity syndrome. It seems that "in conformity" must, at least in this case, actually be interpreted as "exactly the same."

> For example, if there were conflicting experts, would the judge conclude that neither could testify? That only the more persuasive one could? That a psychiatrist could while a psychologist could not? The judge's role is properly limited to verifying credentials, including findings that the scientific field is generally recognized and that the methodology proffered is generally accepted by the expert's colleagues in the field. The judge is not to take over the jury's function of weighing the persuasiveness of the testimony.
> 407 A.2d at 638–39 n. 24.

10. For instance, there was testimony that the victims were told repeatedly not to leave the farm and that they were retrieved if they did; that the farm was an isolated environment; that social supports were removed in that family members were discouraged from seeing the victims and that the victims were repeatedly told that no one cared about them; that their personalities were attacked by constant verbal abuse;

The court, in a criminal jury trial, is neither a fact finder nor a weigher of credibility. To evaluate the theory that a person not physically captive may undergo an involuntary conversion, a court correctly evaluates the methodology utilized to arrive at that conclusion, but not the conclusion itself, which is the province of the jury. The methodology employed by Dr. Stock was a careful, detailed, and lengthy examination of the victims and the facts surrounding their alleged captivity. It is not open to question nor is the argument made by anyone here that that is not an appropriate methodology.[11]

Accordingly, the third element of the *Green* test, perhaps inadvertently, places courts in the position of evaluating experts' conclusions. The court's role is more properly limited to finding that the expert's methodology is generally accepted. The court should not take over the jury's function of weighing the persuasiveness of the testimony.

## C.

The standard of review on appeal of the admission of testimony is abuse of discretion. In order to determine whether the trial judge abused his discretion, we must view the record as it was at the time the ruling was made. At that point in time, the only testimony before Judge Joiner was Dr. Stock's, and he testified that his theory was generally accepted.

that the victims lacked privacy; that they were punished and sometimes rewarded; and that they were physically abused.

11. It is interesting to speculate on the result on this issue if Dr. Stock had not referred to captivity syndrome, but had simply testified that, based on his interviews with and testing of the victims, and his training and experience in this field, in his opinion their wills were overborne and consequently their service was involuntary. This is an entirely plausible scenario in view of Fed.R.Evid. 705, which allows experts to testify without prior disclosure of the underlying facts or data which led to their opinion. It would indeed be ironic if Dr. Stock's testimony was not allowed because he referred to an established branch of learning, captivity syndrome, to bolster his conclusion that Fulmer and Molitoris were psychological hostages.

Dr. Stock testified that involuntary conversion has gained general acceptance throughout the psychiatric and psychological community (App. 51, 35), Judge Joiner found that the testimony could be helpful to the trier of fact to understand the evidence under Fed.R.Evid. 702. Moreover, Judge Joiner also recognized that the *Frye* standard might not be applicable to this type of testimony, but he felt that even if the court was to apply the more restrictive *Frye* test, the testimony was still admissible:

> It's not an answer, in the Court's judgment, that this may be the very first time that someone has said something in court, otherwise, we would never have any testimony in court about any new idea if we prevented that, but he has demonstrated to the Court that the body of experts that seem to be relevant at this point have generally accepted the concepts and idea that he is going to talk about, and he now is in the process of simply taking those ideas, which have general acceptance among a broad, relative and important class of experts, and attempting to apply them to a particular set of facts in this case, and if there is objection to the testimony it's argumentative objection in the sense that ultimately it may be that the testimony may not have value because the particular facts in the case do not support the underlying basis on which he is going to base his conclusions, and that is something that lawyers are most expert in bringing out on cross-examination.

> It's simply no different than a diagnosis of tuberculosis or other things of that kind, it seems to me, at that point. So I'm going to permit the testimony to be received.

(App. 55.)

Judge Joiner's ruling properly recognized the role of the trial judge in admitting expert testimony. This ruling was correct, especially in light of the fact that

the only testimony before the court was that involuntary conversion had gained general acceptance. Even though the defendants had retained experts to testify on their behalf, none of the defendants sought to offer evidence at the time that Dr. Stock was voir dired that involuntary conversion was not generally accepted. Yet defendants possessed at that time the information they now rely on in arguing that Dr. Stock's theory was not generally accepted.[12] I am simply unable to conclude that on this record Judge Joiner abused his discretion in admitting the testimony of Dr. Stock.

### III.

I would address one other issue raised on appeal and not addressed by the majority which could be involved in any retrial of this matter. On appeal, the defendants also argued that the trial judge erred in failing to rule on Dr. Stock's qualifications as an expert. At trial, after counsel for the government questioned Dr. Stock about his education and experience, the following colloquy occurred:

> Counsel: Your Honor, we would offer Dr. Stock as an expert in the field of Forensic Psychiatry and offer his expert testimony to the jury.

> The Court: I don't pass on qualifications, it's up to the jury to. Go ahead and interrogate him.

(App. 101).

The defendants assert that it was error for the court to decline to specifically find that Dr. Stock was qualified. I must disagree.

When the attorney conducting the direct examination of an expert witness concludes that portion of the examination relating to the expert's qualifications, it is common to so indicate to the court in language not unlike that quoted here. The person offering the expert is not seeking a ruling but, rather, signalling that the preliminaries are over and the other side may now voir dire

---

**12.** In *Brown,* the court noted that when a defendant fails to produce rebuttal testimony when given the opportunity to do so, he runs a grave risk that an appellate court will focus on the state of the record at the time the evidence was admitted in deciding whether the trial court abused its discretion. 557 F.2d at 557 n. 17. It seems to me that defendants have taken that gamble here, and it has paid off.

if they desire. If the other side conducts a voir dire and then objects or just objects without a voir dire, the court must then make a ruling *if it is possible to do so.* Often it is not because the key question is not the expert's general qualifications in some field, but whether the precise question on which he will be asked to *opine* is within his field of expertise or meets some other test such as that set forth in the majority opinion. To illustrate here, the question was not Dr. Stock's qualifications—those were impeccable. The question was what he was going to be asked which would trigger an answer comprising an "expert opinion." Obviously, no ruling can be made until the expert is actually asked the question. Certainly the trial judge must rule upon the qualifications of an expert *if challenged* and must make all evidentiary rulings required by objections to specific questions. The Federal Rules of Evidence do not require the "proffering" of an expert as such, however.

The error of the defendants' argument is compounded by the fact that the procedure suggested exacerbates the very thing about which they express concern—an "aura of special reliability" surrounding expert testimony. If the prosecutor in a criminal case completes the background questioning of an expert witness and then turns to the court and says, "I offer this person as an expert," the response should be just what Judge Joiner replied. It is not for the court to add to an "aura of reliability" at this juncture by declaring the witness an expert. The evidentiary matter at issue is the giving of opinion testimony. The requisite rulings will be made when an "expert" is asked to opine. Any ruling prior to that, unless in response to an objection, appears to me to be some type of advisory opinion for which there is no predicate in the Federal Rules of Evidence.